FILED
United States Court of Appeals
Tenth Circuit

December 29, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEFINA C. VILLA,

Defendant - Appellant.

No. 08-8100

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D. Ct. No. 1:07-CR-00036-WFD-1)**

---

Ronald G. Pretty, Cheyenne, Wyoming, appearing for Appellant.

David A. Kubichek, Assistant United States Attorney (Kelly H. Rankin, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Wyoming, Casper, Wyoming, appearing for Appellee.

---

Before **TACHA** and **GORSUCH**, Circuit Judges, and **STAMP**, Senior District Judge[*].

---

**TACHA**, Circuit Judge.

---

A jury convicted defendant-appellant Josefina Villa of possessing with

---

[*]The Honorable Frederick P. Stamp, Jr., Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

intent to distribute at least 500 grams of methamphetamine and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. § 2, and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). On appeal, she challenges: (1) the denial of her motion to suppress evidence of the crimes; (2) the sufficiency of the evidence supporting her conviction for the firearm offense; and (3) her sentence for the firearm offense. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

On the morning of December 6, 2006, Trooper McKay of the Wyoming Highway Patrol pulled over Ms. Villa for speeding on a highway east of Cheyenne, Wyoming. He approached the car on its passenger side where Angela Davis was sitting. In response to questions from the trooper, the women explained they were driving to Minnesota to visit family. Trooper McKay noticed two cell phones on the front console and two small duffel bags in the backseat. He also thought Ms. Villa was acting nervously but that Ms. Davis was acting overly friendly.

After Ms. Villa provided her license, registration, and insurance, Trooper McKay noticed that her license listed a California address but the car was registered in Nevada and the insurance information listed another Nevada address. The car also had been registered and insured only two weeks before. Trooper McKay took Ms. Villa's documents back to his patrol car, where he ran the

information through his dispatch. After her information came back clear, Trooper McKay asked Ms. Villa to join him in the patrol car to clarify some questions. Ms. Villa complied. In the car, Trooper McKay began filling out a warning ticket and asked Ms. Villa where she lived. She explained that she lived in California but that the car was registered in Nevada because her boyfriend lived there. In response to additional questions from Trooper McKay, Ms. Villa stated again that she was going to Minnesota but this time said it was to visit Ms. Davis's family. Ms. Villa could not say to which city in Minnesota they were traveling. Trooper McKay finished writing the ticket, returned Ms. Villa's license, registration, and insurance information to her, and told her she was free to go.

As Ms. Villa was getting out of the patrol car, however, Trooper McKay requested permission to ask her a few more questions. Ms. Villa verbally agreed and remained in the car. Trooper McKay asked her again where the women were going in Minnesota. Ms. Villa said she did not know, because she had just woken up, but that they were planning to stay in Minnesota for two days. When Trooper McKay told her that was a long trip to make for only a two-day visit, Ms. Villa responded that she might fly back, apparently leaving her car in Minnesota.

Trooper McKay asked her to stay in the patrol car while he returned to Ms. Villa's car to question Ms. Davis about their travel plans. Ms. Villa, however, followed Trooper McKay out of the car. Ms. Davis also told Trooper McKay that she was going to Minnesota to visit family for a short time, and that she, too,

might fly back. In contrast to Ms. Villa's statement, however, Ms. Davis indicated that she and Ms. Villa were related and that they were going to visit their family. When Trooper McKay asked how well Ms. Davis knew Ms. Villa, Ms. Davis responded, "like most families do. We just hang around a little bit."

Trooper McKay then asked Ms. Villa for consent to search the car. She refused. He detained both women and called a K-9 unit, which arrived approximately eleven minutes later. The dog alerted to the presence of drugs and a subsequent search of the car revealed two packages of methamphetamine under a panel.

At Ms. Villa's trial, Ms. Davis testified for the government. She explained that Ms. Villa's brother had offered them a .22-millimeter Beretta handgun for their protection during the trip. The women declined the offer but later found the gun packed in their belongings the night before they were stopped by Trooper McKay. From that point, Ms. Villa kept the gun either in her boot or in the car's console. When Trooper McKay pulled them over, Ms. Villa told Ms. Davis to put the gun in her pants. Later, when the women had been arrested and were sitting in the back of the patrol car, Ms. Davis hid the gun in the back seat. Trooper McKay found the gun two months later.

The jury convicted Ms. Villa of possessing with intent to distribute methamphetamine and aiding and abetting, and possessing a firearm in furtherance of a drug trafficking crime. The district court sentenced her to the

ten-year mandatory minimum term for the methamphetamine conviction, *see* 21 U.S.C. § 841(b)(1)(A)(viii), and to a consecutive five-year sentence for the firearm conviction, *see* 18 U.S.C. § 924(c)(1)(A)(i).

## II. DISCUSSION

A.     <u>Denial of Motion to Suppress</u>

Prior to trial, Ms. Villa moved to suppress evidence seized as a result of the traffic stop and subsequent search. The district court denied the motion, which she now appeals.

The touchstone under the Fourth Amendment is reasonableness. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). The reasonableness of a traffic stop is examined under a two-part test: first, whether the officer's action was justified at its inception; and second, whether the officer's action during the stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

Ms. Villa does not dispute that the traffic stop was justified at its inception—i.e., that she was speeding. *See United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004) (a traffic stop is reasonable under the Fourth Amendment "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring") (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995 ) (en banc)). Instead, she first argues that once Trooper

McKay had run her license and registration information through dispatch and it came back clear, there was no longer any continued need for the detention. Thus, according to Ms. Villa, Trooper McKay's instruction that she accompany him to his patrol car and his additional questions regarding her address and travel plans while he issued the ticket were unlawful.

It is well-established that:

A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof of entitlement to operate the car, the driver must be allowed to proceed without further delay for additional questioning.

*United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997). Here, however, Trooper McKay was in the process of writing the warning ticket when he asked Ms. Villa about her address and travel plans; he had not yet issued Ms. Villa the warning citation. In addition, we have often held that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop," *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001), and that such questions are permissible so long as they do not prolong the stop, *see United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). Moreover, given the different addresses listed on Ms. Villa's license, insurance, and registration, it was entirely reasonable for Trooper McKay to ask Ms. Villa to come to the patrol car and to

clarify which address to write on the ticket.[1]

Next, Ms. Villa argues that she did not consent to further questioning by Trooper McKay after he issued the ticket and told her she was free to leave. "Typically, an officer must allow the driver to leave once the initial justification for a traffic stop has concluded." *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave. *See id.* "This general rule, however, is subject to an important exception. Additional questioning unrelated to the traffic stop is permissible if the detention becomes a 'consensual encounter.'" *Id.* (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)). Whether the driver has consented to additional questions and detention turns on whether "a reasonable person would believe he was free to leave or disregard the officer's request for information." *Id.* at 886.

Ms. Villa relies primarily on two facts to argue that a reasonable person would not have felt free to disregard Trooper McKay's request to answer additional questions: (1) Trooper McKay was armed and in uniform; and (2) she

---

[1]Citing Wyo. Stat. Ann. § 31-7-137, Ms. Villa contends that "Wyoming law mandates that the address on your driver's license is the correct address and therefore the 'request to clarify' was nothing more than a smokescreen to continue to detain [Ms. Villa]." Applt. Br. 23. But even if § 31-7-137 imposes such a requirement (which we do not suggest), the statute is inapplicable to Ms. Villa, who owned a California driver's license.

had not yet fully exited his patrol car.  We have held, however, that these two factors alone are not sufficient to cause a reasonable person to feel that he is not free to leave.  In *United States v. Bradford*, 423 F.3d 1149 (10th Cir. 2005), the defendant was sitting in the back of the officer's patrol car when the officer asked for answers to further questions.  We explained that "[t]he fact that [the defendant] was sitting in . . . [the trooper's] patrol car, without more, does not make her consent involuntary."  *Id*. at 1158.  We went on to state:

> Although we are troubled by the fact that [the defendant] was sitting in the patrol car while [the officer] questioned her after handing back her documents, there is no indication here that [the officer] made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled," suggesting that the detention had not ended.

*Id.* at 1159 (citation omitted).  Similarly, in *United States v. Hernandez*, we reasoned:

> We conclude that a reasonable person would have believed he was free to leave.  [The officer] had returned [the defendant's] license and registration and told him he was free to go.  [The defendant] must have believed he was free to leave at that point because the district court found he turned to get out of the car.  [T]he only officer present then inquired if he could ask some questions.  There was no evidence that [the officer] used a commanding or threatening manner or tone of voice, displayed a weapon, or touched [the defendant].

93 F.3d 1493, 1499 (10th Cir. 1996).

In this case, Ms. Villa was in the process of exiting the patrol car, but there was no evidence of a coercive show of authority that would make a reasonable

person feel that she was not free to leave. Trooper McKay was uniformed and armed, but that also appears to have been the case in *Bradford* and *Hernandez*. *See also United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990) (fact that officer is in uniform, without more, is insufficient to demonstrate consent was involuntary). Absent a display of the weapon or some other type of show of authority, we conclude that Ms. Villa voluntarily consented to the further questioning.

Finally, Ms. Villa argues that Trooper McKay did not have reasonable suspicion to detain Ms. Villa while he spoke with Ms. Davis, and later to detain both of them while he called for the K-9 unit. *See Hunnicutt*, 135 F.3d at 1349 (lengthening the detention beyond that necessary for the initial stop is permissible only if the detention has become a consensual encounter or the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring"). We conclude that Trooper McKay had reasonable suspicion of criminal activity that supported these detentions. At the point when Trooper McKay decided to question Ms. Davis, Ms. Villa had given him the following inconsistent and unusual statements: she had first told him they were going to visit family, then clarified that it was Ms. Davis's family; although she was driving the car, she did not know which city they were visiting; her reason for not knowing the destination was because she had just woken up; the women were driving all the way from California to Minnesota for only a two-day visit; and Ms.

Villa might leave her newly purchased car in Minnesota and fly back to California. Given these statements, in addition to Ms. Villa's nervousness, Trooper McKay had specific, articulable facts which reasonably supported his belief that Ms. Villa's trip was for an illicit purpose and thus justified her continued detention. *See United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (implausible or unusual travel plans, combined with unusual nervousness, can contribute to reasonable suspicion). This reasonable suspicion did not dissipate upon Trooper McKay's conversation with Ms. Davis. Some of her statements contradicted Ms. Villa's, such as her explanation that the women were going to visit "their" family. She also suggested that she might fly back to California, which would have left the car in Minnesota without its owner or passenger. Trooper McKay was therefore justified in detaining both women for eleven minutes while a K-9 unit was called to the vehicle. Finally, to the extent Ms. Villa contends that the subsequent search was unlawful, it is well-established that a dog sniff provides the requisite probable cause to search a vehicle for drugs. *See United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994).

B.     Sufficiency of the Evidence: Possessing a Firearm "In Furtherance Of" a Drug Trafficking Crime

18 U.S.C. § 924(c)(1)(A) prohibits using or carrying a firearm during or in relation to a drug trafficking crime, or possessing a firearm in furtherance of a drug trafficking crime. The predicate crime in this case was Ms. Villa's

methamphetamine offense, and she was prosecuted under the possessing-in-furtherance prong of the statute. On appeal, she does not challenge whether she possessed the firearm; rather, she contends that her possession did not further the drug trafficking crime.

Merely possessing a firearm does not establish the "in furtherance" element of § 924(c)(1)(A). *United States v. Garza*, 566 F.3d 1194, 1202 (10th Cir. 2009). Instead, the government must prove that "the weapon furthered, promoted or advanced a drug trafficking crime." *United States v. Poe*, 556 F.3d 1113, 1127 (10th Cir. 2009) (quotations omitted). "This standard is satisfied if the firearm was kept available for use should it be needed during a drug transaction, and the defendant intended the firearm to be accessible for that purpose." *Id.* To assess whether the defendant had the requisite intent, we consider a number of factors, including:

> (1) the type of drug activity conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) the legal status of the firearm, (5) whether the firearm was loaded, (6) the proximity of the firearm to drugs or drug profits, and (7) the time and circumstances under which the firearm was found.

*Id.* Thus, while possession of a firearm in proximity to drugs does not necessarily show that the firearm was possessed in furtherance of drug trafficking, "it could be considered by the jury along with other circumstantial evidence to determine whether the defendant intended to possess the weapon 'in furtherance of' drug trafficking." *United States v. Lott*, 310 F.3d 1231, 1247 (10th Cir. 2002).

-11-

In this case, Ms. Villa kept the .22-millimeter Beretta handgun in her boot and in the console of the car where the drugs were found. Although Ms. Davis testified that Ms. Villa's brother had put it in the women's belongings unbeknownst to them, and that the two women had been looking for a place to discard the gun when they were pulled over (thereby demonstrating a lack of intent to use it), the jury was free to disbelieve this testimony. As the government argues, the evidence—viewed with an eye toward the relevant factors—was sufficient to support the jury's finding that Ms. Villa possessed the handgun in furtherance of drug trafficking: (1) the type of drug activity being conducted was not limited to small-time users; instead, Ms. Villa was transporting approximately $250,000 worth of methamphetamine from California to Minnesota; (2) Ms. Villa kept the gun where she had immediate access to it; (3) the gun was loaded; and (4) the gun was kept in close proximity to the drugs in the car. In light of our precedent on the matter, sufficient evidence supports Ms. Villa's conviction for possessing the firearm in furtherance of the methamphetamine trafficking.

C.    Consecutive Sentence for the § 924(c)(1)(A)(i) Conviction

Ms. Villa was sentenced to the ten-year statutory mandatory minimum for the methamphetamine conviction. *See* 21 U.S.C. § 841(b)(1)(A)(viii). The § 924(c)(1)(A)(i) conviction carries a five-year mandatory minimum sentence, which the district court imposed to run consecutively to the § 841 sentence. On appeal, Ms. Villa contends that because the sentence for the predicate offense

underlying her § 924(c) conviction provides for a greater minimum sentence than that for the § 924(c) conviction itself, the district court erred in imposing the two sentences.

Ms. Villa's argument is grounded in the so-called "except clause" or "prefatory clause" of § 924(c), which states:

> (c)(1)(A) *Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law*, any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A) (emphasis added).

Section 924(c) goes on to provide for longer sentences for specified types of firearms (such as short-barreled rifles and machineguns) and for repeat offenders. *Id*. § 924(c)(1)(B), (c)(1)(C). The subsection also states that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." *Id*. § 924(c)(1)(D).

-13-

Ms. Villa contends that under the prefatory clause to § 924(c), a greater minimum sentence is provided by § 841(b)(1)(A)(viii), and therefore this ten-year sentence either displaces the five-year sentence under § 924(c)(1)(A)(i) or mandates that it run concurrently to the § 841 sentence. Several courts of appeals have considered this or a similar interpretation of § 924(c). Eight have rejected it. *See United States v. Segarra*, 582 F.3d 1269 (11th Cir. 2009); *United States v. Abbott*, 574 F.3d 203 (3d Cir. 2009); *United States v. Easter*, 553 F.3d 519 (7th Cir. 2009); *United States v. Parker*, 549 F.3d 5 (1st Cir. 2008); *United States v. Collins*, 2006 WL 2921225 (5th Cir. Oct. 12, 2006); *United States v. Jolivette*, 257 F.3d 581 (6th Cir. 2001); *United States v. Studifin*, 240 F.3d 415 (4th Cir. 2001); *United States v. Alaniz*, 235 F.3d 386 (8th Cir. 2000). One circuit has embraced it. *See United States v. Williams*, 558 F.3d 166 (2d Cir. 2009); *United States v. Whitley*, 529 F.3d 150 (2d Cir. 2008). Today we join the majority of those courts and hold that the prefatory clause to § 924(c) refers only to a minimum sentence provided by § 924(c) or any other statutory provision that proscribes the conduct set forth in § 924(c).

In interpreting a statute, we start with its language, *Williams v. Taylor*, 529 U.S. 420, 431 (2000), giving effect to its "most natural reading." *United States v. Ressam*, 533 U.S. 272 (2008). In this way, "[w]e consider not only the bare meaning of the [text] but also its placement and purpose in the statutory scheme," *United States v. Bailey*, 516 U.S. 137, 145 (1995), because "the meaning of

-14-

statutory language, plain or not, depends on context." *Id.* (alterations and quotations omitted).

The prefatory clause to § 924(c) refers to "a greater minimum sentence . . . provided by . . . any other provision of law." The clause, however, "does not say a 'greater minimum sentence' *for what*," though it must "have *some* understood referent to be intelligible." *Parker*, 549 F.3d at 11. Ms. Villa suggests that the referent should be broadly conceived to include a minimum sentence for the predicate crime underlying the § 924(c) conviction. We disagree. The prefatory clause does not "mean 'when a greater minimum sentence *for any other crime* is otherwise provided by law.'" *Abbott*, 574 F.3d at 211 (quoting *Parker*, 549 F.3d at 11). Indeed, the text of § 924(c) contains no such language. *See Alaniz*, 235 F.3d at 389 ("We have scoured the statutory language, yet we find no support for the proposition . . . that subdivision (c)(1)(A)'s 'greater minimum sentence' clause applies to the predicate drug trafficking crime or crime of violence of which a particular defendant has been convicted."); *Parker*, 549 F.3d at 11 (reading the referent to mean "'any other crime related to this case' or 'the underlying drug crime or crime of violence' . . . require[s] reading into the clause a referent not literally expressed").

Moreover, the context of the statute compels a more narrow interpretation of the clause's referent. The phrase "except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of

law" is followed directly by the specific types of conduct prohibited under § 924(c). Because there is no linguistic or contextual demarcation separating the proscribed conduct from the prefatory clause, the most natural reading of that language "connotes a comparison between alternative minimum sentences for a violation of § 924(c), not between sentences for separate violations of § 924(c) and another statute." *Abbott*, 574 F.3d at 211; *see also Easter*, 553 F.3d at 526 ("In the contest between reading the 'except' clause to refer to penalties for the offense in question or to penalties for any offense at all, we believe the former is the most natural."). Accordingly, "a defendant convicted under § 924(c)(1) shall be sentenced to a term of imprisonment set forth in § 924(c)(1)(A) unless subsections (c)(1)(B) or (c)(1)(C), or another penalty provision elsewhere in the United States Code, requires a higher minimum sentence for that § 924(c)(1) offense." *Easter*, 553 F.3d at 526;[2] *see also Abbott*, 574 F.3d at 208 ("In referring to alternative minimum sentences, the prefatory clause mentions 'any other provision of law' to allow for additional § 924(c) sentences that may be codified elsewhere in the future—in the same way, for example, that 18 U.S.C. § 924

---

[2]For example, § 924(j)(1) provides for life imprisonment for a defendant who, in the course of violating § 924(c), causes the first-degree murder of another person. *See* 18 U.S.C. § 924(j)(1); 18 U.S.C. § 1111(b). Thus, a defendant who might otherwise be subject to a five-, seven-, or ten-year sentence under § 924(c)(1)(A)(i)–(iii) would instead be sentenced under § 924(j)(1), as that provision provides for a greater minimum sentence for the § 924(c) offense. *Cf. United States v. Battle*, 289 F.3d 661 (10th Cir. 2002) (affirming a sentence under § 924(c)(1) and (j)(1) of life in prison that was imposed consecutively to the sentence for the predicate offense underlying the § 924(c) conviction).

prescribes a sentence for violations of 18 U.S.C. § 922.").

This reading is not only the most faithful to the statutory language, it also avoids absurd results at odds with the statute's purpose. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—*at least where the disposition required by the text is not absurd*—is to enforce it according to its terms.") (emphasis added and quotations omitted). The prefatory clause first appeared as part of the 1998 amendment to § 924(c)(1), which was enacted in response to the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995). *Easter*, 553 F.3d at 526. In *Bailey*, the Supreme Court adopted a narrow definition of the term "use"; thereafter, Congress broadened § 924(c)(1) to prohibit not only using or carrying a firearm but also possessing a firearm.[3]

---

[3]The prior version of § 924(c)(1) read:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any

(continued...)

*Abbott*, 574 F.3d at 207 & n.3; *Alaniz*, 235 F.3d at 389.  But the interpretation

advanced by Ms. Villa and the Second Circuit would narrow—not expand—the

reach of § 924(c), as "many defendants convicted under § 924(c)(1) would receive

no punishment for the conviction."  *Easter*, 553 F.3d at 526; *see also Alaniz*, 235

F.3d at 390 ("Congress meant to broaden the reach of the statute, not further

restrict it.").  Even more nonsensical is the fact that the most culpable defendants

would be the ones who would escape such punishment.  As the *Alaniz* court

explained:

> That construction would punish those guilty of severe offenses more
> leniently, and those guilty of less severe offenses more stringently,
> an illogical result.  The most serious drug crimes and crimes of
> violence (those already carrying mandatory minimum sentences)
> would not be enhanced by a consecutive firearm sentence despite the
> fact that a gun was involved.  Meanwhile, less serious crimes (to
> which no minimum mandatory sentences apply) would be enhanced
> by a consecutive firearm sentence when committed with a gun.

235 F.3d at 389.  In our view, Congress did not intend such a bizarre result.[4]  *See*

---

[3](...continued)
person convicted of a violation of this subsection, nor shall the term
of imprisonment imposed under this subsection run concurrently with
any other term of imprisonment including that imposed for the crime
of violence or drug trafficking crime in which the firearm was used
or carried.

21 U.S.C. § 924(c)(1) (1996).

[4]The *Whitley* court reasoned that a district court's sentencing discretion
would permit it to increase or decrease a particular defendant's sentence in order
to maintain a more logical sentencing scheme.  *See Whitley*, 529 F.3d at 155.  We
find this "solution" inadequate, as it amounts to a tacit recognition of the

(continued...)

*Abbott*, 574 F.3d at 209.

In short, we join the majority of courts to have addressed the issue and conclude the most natural reading § 924(c) is that its prefatory clause refers only to a minimum sentence provided by § 924(c) or any other statutory provision that proscribes the conduct set forth in § 924(c). Accordingly, a defendant convicted under § 924(c)(1) shall be sentenced to a term of imprisonment set forth in § 924(c)(1)(A) unless subsections (c)(1)(B) or (c)(1)(C), or another penalty provision elsewhere in the United States Code, requires a higher minimum sentence for that § 924(c)(1) offense. Thus, the district court did not err in Ms. Villa's case by sentencing her to ten years on the methamphetamine conviction to be followed by a five-year sentence for the § 924(c)(1)(A) conviction.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Ms. Villa's convictions and sentence.

---

[4](...continued)
absurdity of the minority's interpretation. *See Abbott*, 574 F.3d at 210 ("This view asks too much because it fixes the statute as illogical and anomalous, then posits an ad hoc solution in each individual case."). In addition, Congress could not have contemplated this "solution" at the time of the 1998 amendment, as sentencing courts did not enjoy such discretion until 2005. *See United States v. Booker*, 543 U.S. 220 (2005).