HOLMES, Circuit Judge,
dissenting.
I respectfully dissent. The sole question on appeal is whether a plasma-donation center constitutes a “service establishment” within the meaning of 42 U.S.C. § 12181(7)(F). In contrast to the majority, I do not believe that such centers fall within the ambit of the term “service establishment.” Therefore, I would affirm the district court’s judgment.
I
A '
In 42 U.S.C. § 12181(7)(F), Congress identified a category of “private entities [that] are considered public accommodations” — i.e., service establishments — under Title III of the Americans with Disabilities Act of 1990 (“ADA”), 42 U.S.C. §§ 12101-12213. Congress enumerated the category as follows: “a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.” 42 U.S.C. § 12181(7)(F) (emphasis added).
We construe Title III with its broad remedial purpose in mind. See, e.g., PGA Tour, Inc. v. Martin, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (discussing the “broad mandate,” “comprehensive character,” and “sweeping purpose” of the ADA in “eliminating] discrimination against disabled individuals! ] and ... integrating] them ‘into the economic and social mainstream of American life.’ ” (citations omitted)); id. at 676, 121 S.Ct. 1879 (stating that Title Ill’s legislative history indicates that the categories of “public accommodation[s]” “should be construed liberally” (citation omitted)); see also Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 983 (10th Cir. 2002) (“In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end.” (quoting Wheeler v. Hurdman, 825 F.2d 257, 262 (10th Cir. 1987))); Butler v. City of Prairie Vill, 172 F.3d 736, 744 (10th Cir. 1999) (noting that “the ADA’s remedial purposes are broad and far-reaching”). Nevertheless, I would conclude that a plasma-donation center is not a “service establishment” within the meaning of § 12181(7)(F).
More specifically, I would conclude that the district court correctly ruled — by reference to the examples of service establishments listed in § 12181(7)(F) — that service establishments offer certain services in exchange for monetary compensation (i.e., a fee). Going further, in my view, every service establishment listed in § 12181(7)(F) shares some key unifying traits: they offer the public a “service” (1) in the form of (a) expertise (e.g., barbers, beauticians, shoe-repair craftsman, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, pharmacists, health care providers, and hospitals) or (b) specialized equipment (e.g., laundromats and gas stations), (2) for use in achieving some desired end, (3) in exchange for monetary compensation.
With the foregoing considerations in mind, it becomes clear that plasma-donation centers are not service establishments within the meaning of subsection (7)(F). First, plasma-donation centers do not receive a fee from members of the public in exchange for any services that they provide. Second, to the extent that plasma-donation centers provide services to the public, they do not do so for the public’s *1236 use in achieving a desired end; instead, they provide them for the centers’ use in achieving a desired end — the collection of plasma for sale to pharmaceutical companies. For these two principal reasons, plasma-donation centers are fundamentally unlike the service establishments listed in 42 U.S.C. § 12181(7)(F), and I would conclude that they do not fall within the scope of that statute. Consequently, plasma-donation centers do not qualify as public accommodations under Title III of the ADA, and the district court therefore did not err in dismissing Mr. Levorsen’s complaint.
1
“[0]ur primary task in interpreting statutes [is] to determine congressional intent,” and the starting point for discerning congressional intent is the plain language of the statute. Coffey v. Freeport McMoran Copper & Gold, 581 F.8d 1240, 1245 (10th Cir. 2009) (per curiam) (quoting Russell v. United States, 551 F.3d 1174, 1178 (10th Cir. 2008)); see United States v. West, 671 F.3d 1195, 1199 (10th Cir. 2012) (stating that “we first and foremost look to the statute’s language,to ascertain Congressional intent”). If the statute’s language is clear, our analysis comes to an end. See, e.g., Woods v. Standard Ins. Co., 771 F.3d 1257, 1263 (10th Cir. 2014); United States v. Sprenger, 625 F.3d 1305, 1307 (10th Cir. 2010); Coffey, 581 F.3d at 1245. That is, if the statute is unambiguous, we need not “resort ... to the statutory history” or other extrinsic sources. Wyodak Res. Dev. Corp. v. United States, 637 F.3d 1127, 1135 (10th Cir. 2011); see also Anto-nin Scalia & Bryan A. Garner, Reading Law: The InteRpretation of Legal Texts 56 (2012) (“[T]he purpose [of a statute] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter’s desires.”). In fact, “[w]e will look beyond the plain language of a statute only if the result is an absurd application of the law.” United States v. Brown, 529 F.3d 1260, 1265 (10th Cir. 2008).
We do not, however, construe statutory terms in isolation. See, e.g., McDonnell v. United States, — U.S. -, -, 136 S.Ct. 2355, 195 L.Ed.2d 639 (2016) (“To choose between those competing definitions, we look to’ the context in which the words appear.”); United States v. Brune, 767 F.3d 1009, 1022 (10th Cir. 2014) (“[N]o statute is an island unto itself. We can look around to provide substance and context to a potentially unclear term.”); see also Bruñe, 767 F.3d at 1022-23 (“[W]e are required to construe a phrase within a statute with reference to its accompanying words ‘in order to avoid the giving of unintended breadth to the Acts of Congress.’ ” (quoting Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961))). Indeed, “the meaning of statutory language, plain or not, depends on context.” First Nat’l Bank of Durango v. Woods (In re Woods), 743 F.3d 689, 694 (10th Cir. 2014) (quoting United States v. Villa, 589 F.3d 1334, 1343 (10th Cir. 2009)); see also Villa, 589 F.3d at 1343 (observing that, in order to give the language of a statute its “most natural reading,” we “consider not only the bare meaning of the [text] but also its placement and purpose in the statutory scheme” (alteration in original) (citations omitted)). Thus, “[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Salazar v. Butterball, LLC, 644 F.3d 1130, 1137 (10th Cir. 2011) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).
Furthermore, in interpreting the plain meaning of statutory terms, courts frequently use various canons of interpretation “designed to help judges determine *1237 the Legislature’s intent as embodied in particular statutory language.” Chickasaw Nation v. United States, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). Two canons, ejusdem generis and noscitur a sociis, are particularly relevant for interpreting § 12181(7)(F)’s statutory language. Under the ejusdem generis canon, “when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.” Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 223, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008) (quoting Norfolk & W. Ry. Co. v. Am. Train Dispatchers’ Ass’n, 499 U.S. 117, 129, 111 S.Ct. 1156,113 L.Ed.2d 95 (1991)). The interpretive canon noscitur a sociis similarly counsels that “a word is known by the company it keeps,” id. at 226, 128 S.Ct. 831 (quoting S.D. Warren Co. v. Me. Bd. of Envtl. Prot., 547 U.S. 370, 378, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006)) — i.e., the word “may be ‘given more precise content by the neighboring words with which it is associated,’ ” United States v. Stevens, 559 U.S. 460, 474, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting United States v. Williams, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)); see also United States v. Phillips, 543 F.3d 1197, 1206 (10th Cir. 2008) (“Under the venerable interpretive canons of noscitur a sociis and ejusdem generis, the meaning of a catchall phrase is given precise content by the specific terms that precede it.”).
2
At issue in this case is subsection (7)(F); it includes in the definition of “public accommodations”: “a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.” 42 U.S.C. § 12181(7)(F) (emphasis added). The district court sought to derive a “common theme” from the enumerated examples, and concluded that they all involve “the provision of goods or services to the public, in exchange for money.” Aplt.’s App. at 37. In effect, the court applied the ejusdem generis and noscitur a sociis canons.
The majority concludes that the district court erred in applying these canons because the ordinary meaning of the statutory language is clear. This conclusion, however, overlooks the key principle that such canons of statutory construction are aids in construing the language itself — not tools to be relied on only in the face of ambiguity. See McDonnell, — U.S. at-, 136 S.Ct. 2355 (applying the noscitur a sociis canon to an unambiguous statute in giving it a “more limited. reading”); Chickasaw Nation, 534 U.S. at 94, 122 S.Ct. 528 (stating that canons of construction are “designed to help judges determine the Legislature’s intent as embodied in particular statutory language” (emphasis added)); Brune, 767 F.3d at 1022-23 (stating that “simply resorting to a dictionary definition in this case is not especially helpful” because “[t]he multiple definitions of [the residual phrase at issue] preclude an obvious, unitary usage,” but “the wording of the statute invites the application of the canon of construction of ejusdem generis[ ] [because] ‘general words follow specific words in a statutory enumeration ...’” (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001))); CBS, Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1225 (11th Cir. 2001) (“[T]he canons of construction focus on the text actually approved by Congress and made a part of our country’s laws. ... Canons of construction are essentially tools which help us to determine whether the meaning of a statutory provision is sufficiently plain, in light of the text of the statute as a whole, to avoid the need to consider extrinsic evidence of Congress’ *1238 intent.” (footnote omitted)); cf. In re Woods, 743 F.3d at 694 (“[T]he meaning of statutory language, plain or not, depends on context.” (quoting Villa, 589 F.3d at 1343)). Thus, the consideration of interpretative canons is not a step beyond a plain-meaning analysis; instead, as here, it can be part and parcel of such an analysis and complement any reliance on dictionary definitions of the relevant terms.
Indeed, the single case the majority cites in support of its assertion that resort to canons of construction is appropriate only in the face of an ambiguity or an irrational result does little to advance that position. In Edwards v. Valdez, our court made the unremarkable point that courts should look to legislative history only when faced with a statutory ambiguity. See 789 F.2d 1477, 1481 (10th Cir. 1986) (“[A]b-sent ambiguity or irrational result, the literal language of a statute controls. When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent.” (citation omitted)). This case makes no mention of interpretive canons, nor does it in any way suggest that consideration of such canons amounts to a departure from a plain-meaning analysis of a statute. I thus must disagree with the majority’s assumption that the canons that the district court implicitly invoked have no role to play in the present analysis absent a statutory ambiguity or irrational result; rather, these canons are directly relevant to our plain-meaning analysis.
Furthermore, the majority’s suggestion that applying these canons here amounts to “interpretative gymnastics ... [that are] inappropriate given our duty to liberally construe § 12181(7)(F)” is misguided. Maj. Op. at 1231. Though we construe statutes like Title III of the ADA liberally to effectuate their remedial purposes, see, e.g., PGA Tour, 532 U.S. at 676, 121 S.Ct. 1879, that does not mean that we “ex-tendí ]” the relevant language “beyond the just and ordinary sense of the terms,” 1 Joseph Story, COMMENTARIES on the ConSTITUTION OF THE UNITED States § 429, at 412 (Fred B. Rothman & Co. 1991) (1833) (“Where a power is remedial in its nature, there is much reason to contend, that it ought to be construed liberally. ... But this liberality of exposition is clearly inadmissible, if it extends beyond the just and ordinary sense of the terms.”); see Symons v. Chrysler Corp. Loan Guarantee Bd., 670 F.2d 238, 241 (D.C. Cir. 1981) (“The fact that legislation has a remedial purpose, however, does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress.”); see also Scalia & Garner, supra, at 364 (citing the COMMENTARIES and criticizing the so-called “remedial-statute rule”). And the weight of authority cited above makes clear that “venerable interpretive cannons” like ejus-dem generis and noscitur a sociis are useful and proper tools to employ in discerning the just and ordinary sense of a statute’s terms. Phillips, 543 F.3d at 1206.
In short, I would conclude that the district court’s decision to apply, at least tacitly, the canons of ejusdem generis and noscitur a sociis was not erroneous.[1] *1239 Moreover, this conclusion is bolstered by the recognition that several of our sister circuits have used noscitur a sociis in interpreting § 12181(7). See, e.g., Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114 (9th Cir. 2000); Ford v. Schering-Plough Corp., 145 F.3d 601, 614 (3d Cir. 1998); Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc). In my view, therefore, these canons are helpful to the inquiry called for here, and I resort to them.
3
Having reviewed the examples listed in § 12181(7)(F) with the benefit of the foregoing interpretive canons, I agree with the district court that service establishments offer services to the public in exchange for compensation.[2] Every service establish *1240 ment listed in that subsection offers a service to the public in exchange for compensation: laundromats and dry cleaners offer services involving the cleaning of clothes in exchange for a fee, barbers and beauticians offer to cut and style hair in exchange for a fee, shoe-repair businesses offer to repair shoes in exchange for a fee, and so on.[3] Therefore, I would conclude that service establishments offer services to the public in exchange for a fee (i.e., monetary compensation).
The district court did not expressly opine on the kinds of “services” that the statute contemplates. Undertaking a de novo study of the examples listed in subsection (7)(F), however, offers some dis-cernable clues. Specifically, every service establishment listed in subsection (7)(F) provides the public a “service” in the form of (1) expertise (e.g., barbers, beauticians, shoe-repair businesses, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, health care providers, and hospitals), or (2) specialized equipment (e.g., laundromats and gas stations).[4] Moreover, the services that such establishments provide to the public (not surprisingly) are intended for the public’s use in achieving a desired end (e.g., a hair cut, clean clothes, legal advice).[5] Therefore, *1241 viewing the statute with the foregoing considerations in mind, every service establishment listed in § 12181(7)(F) shares some key unifying traits: they offer to the public a “service” (1) in the form of (a) expertise (e.g., barbers, beauticians, shoe-repair craftsman, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, pharmacists, health care providers, and hospitals) or (b) specialized equipment (e.g., laundromats and gas stations), (2) for use in achieving some desired end of the public, (8) in exchange for compensation.
In contrast to this method of arriving at a definition of “service establishment,” the majority contends that we may glean the meaning of the phrase by simply combining the dictionary definitions of the terms “service” and “establishment.” This analysis is misguided, however, because the operative term under subsection (7)(F) is “service establishment” — a statutory term that my analysis shows has a meaning quite distinct from the dictionary definitions of its component words. Although the ordinary meaning of the terms “service” and “establishment” may be helpful in discerning the meaning of the statutory term “service establishment,” it is critical that courts eschew the analytical misstep of concluding that the unambiguous meaning of a statutory term may be divined perforce from the ordinary meaning of its component terms. See Yates v. United States, — U.S.-, 135 S.Ct. 1074, 1081, 191 L.Ed.2d 64 (2015) (plurality opinion) (“Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words.”); see also Barks v. Silver Bait, LLC, 802 F.3d 856, 862 (6th Cir. 2015); Radiance Found., Inc. v. NAACP, 786 F.3d 316, 324 (4th Cir. 2015). Regrettably, the majority’s narrow focus on the dictionary definitions of the terms “service” and “establishment” leads it to fall prey to precisely this analytical misstep. As a consequence, the majority misguidedly eschews the well-established contextual methodology of examining the statutory language surrounding the term at issue. See, e.g., Yates, 135 S.Ct. at 1082 (plurality opinion) (“In law as in life, however, the same words, placed in different contexts, sometimes mean different things.”); Brune, 767 F.3d at 1022 (“[N]o statute is an island unto itself.”).[6]
*1242 In sum, I would conclude that to qualify as a “service establishment” under § 12181(7)(F), an entity must offer the public a service in the form of expertise or specialized equipment for use in achieving some desired end of the public in exchange for compensation. As explained below, plasma-donation centers do not satisfy this description.
4
In arguing that plasma-donation centers are “service establishments” under subsection (7)(F), Mr. Levorsen and the United States assert that “a plasma donation center provides at least two discrete services: (1) screening the individual’s blood to ensure the donor’s eligibility for a donation and (2) using its technology and trained personnel to extract and properly process the individual’s plasma.” Aplt.’s Opening Br. at 20; see also Br. for U.S. as Amicus Curiae at 22 (“Plasma donation centers have these same characteristics [as the examples listed in § 12181(7)(F)]. They provide the specialized equipment needed to procure plasma and trained personnel to assess donor eligibility, operate the equipment, etc.”). For purposes of my analysis, I assume that they are correct. Indeed, in some material respects, these two alleged services seem to fit comfortably within the category of “services” that, in my view, subsection (7)(F) contemplates, in that they would involve providing the public with expertise (e.g., blood screening for donor eligibility) and specialized equipment (e.g., equipment capable of performing plasmapheresis).
However, I would nonetheless conclude that under the definition of “service establishment” discussed above, for two principal reasons, plasma-donation centers like Octapharma fail to qualify as service establishments within the meaning of § 12181(7)(F). First, plasma-donation centers do not receive a fee from members of the public in exchange for any services that they furnish. Quite the obverse is true: the centers give members of the public a fee for tendering to them a commodity in the form of plasma or, alternatively, for performing — at least in a colloquial sense — the “service”[7] of donating plasma. Put more concretely, unlike the service *1243 establishments found in subsection (7)(F), Octapharma did not receive money from Mr. Levorsen in exchange for a service; instead, it paid Mr. Levorsen. Therefore, plasma-donation centers are fundamentally unlike the service establishments of subsection (7)(F); all of them provide services to the public in exchange for a fee.
Second, to the extent that plasma-donation centers provide services to the public — such as those services identified by Mr. Levorsen and the United States — they do not do so for the public’s use in achieving a desired end; instead, they provide them for the centers’ use in achieving a desired end. More specifically, plasma-donation centers provide the public with the expertise associated with blood screening and the specialized equipment necessary to collect plasma so that the centers can sell the plasma to their customers in the pharmaceutical industry (i.e., the desired end) — not so that they can assist the public to achieve some desired end. Or, viewed through the lens of these facts, Octaphar-ma provided Mr. Levorsen its expertise and specialized equipment so that it could obtain his plasma for sale (i.e., the desired end), not to allow Mr. Levorsen to achieve some desired end.
This Octapharma-Levorsen scenario is patently at odds with the service-establishment paradigm that subsection (7)(F) envisions: specifically, every service establishment listed in that subsection offers members of the public a service — i.e., expertise or specialized equipment — for use in achieving an end desired by them (e.g., clean clothes, a haircut, repaired shoes)— not an end desired by the service establishment. Thus, the majority’s conclusion that plasma-donation centers are service establishments under subsection (7)(F) effectively turns the statute’s service model on its head — the recipient of the desired end (as well as the payor) is the plasma-donation center and not the public.[8]
Indeed, once one recognizes that it is the plasma-donation center, and not the public, that is the recipient of the desired end, the first point of distinction discussed supra between plasma-donation centers and subsection (7)(F)’s service establishments — i.e., the fact that plasma-donation centers pay a fee rather than receive one — makes perfect sense. Specifically, because the centers are the ultimate recipients of the desired end, it should not be surprising that the centers are the ones providing the compensation, rather than the public.
In sum, guided by well-settled canons of statutory construction, I would conclude that plasma-donation centers are fundamentally unlike the service establishments listed in 42 U.S.C. § 12181(7)(F). And, consequently, they do not fall within the ambit of that provision. It ineluctably follows that plasma-donation centers are not public accommodations under Title III of the ADA. Accordingly, I would hold that the district court did not err in dismissing Mr. Levor-sen’s complaint.
B
The foregoing conclusion — that plasma-donation centers are not service establish *1244 ments within the ken of subsection (7)(F) — rests squarely on the plain terms of the statute, viewed through the prism of well-settled canons of interpretation that allow consideration of the relevant statutory context. And that conclusion, I believe, is a sufficient basis for affirming the district court’s judgment. However, it is strongly reinforced by the observation that plasma-donation centers resemble manufacturers much more than they do the kind of entities that customarily provide services to the public under subsection (7)(F). Plasma-donation centers manufacture a product: plasma. They derive this product from a raw commodity — i.e., whole blood— that donors provide in exchange for a fee. In this regard, plasma-donation centers are more like paper mills — a type of manufacturer — than the typical business that provides services to the public under subsection (7)(F). Paper mills, like plasma-donation centers, offer a fee in exchange for a raw first-stage input (wood), which they convert first to pulp and, ultimately, into a marketable end-product (paper), for sale to end users.[9]
In accord with this observation, at least for some purposes, Congress clearly regards plasma-donation centers as manufacturers. See, e.g., 42 U.S.C. § 262(a)(l)(B)(ii) (requiring that each package of a biological product be marked with the identity “of the manufacturer of the biological product”); id. § 262(i)(l) (“The term ‘biological product’ means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, [or] blood component ... applicable to the prevention, treatment, or cure of a disease or condition of human beings.” (emphasis added)).
Moreover, a regulatory agency, the Federal Drug Administration (“FDA”), too, regards plasma-donation centers as “manufacturers,” and all their activities— including the services that Mr. Levorsen and the United States identified — as “steps' in the manufacturing of Source Plasma.” 21 C.F.R. § 640.71(a) (“All steps in the manufacturing of Source Plasma, including donor examination, blood collection, plasmapheresis, laboratory testing, labeling, storage, and issuing shall be performed by personnel of the establishment licensed to manufacture Source Plasma ....”); id. § 600.3(t) (“Manufacturer means any legal person or entity engaged in the manufacture of a product subject to license under the act ....”); id. § 606.171(a) (“Who must report under this section? You, a licensed manufacturer of blood and blood components, including Source Plasma .... ”).
Thus, the observation that plasma-donation centers resemble manufacturers much more than they do the typical business that provides services to the public under subsection (7)(F) is validated by the regulatory judgment of Congress and the FDA. And this observation bolsters the conclusion that I would reach based on an analysis of the plain terms of § 12181(7)(F)— viz., plasma-donation centers are not service establishments within the meaning of subsection (7)(F).
II
For the foregoing reasons, I am constrained to dissent. Contrary to the major *1245 ity, I would conclude that the district court did not err in dismissing Mr. Levorsen’s complaint because he failed to demonstrate, as a matter of law, that plasma-donation centers are service establishments under 42 U.S.C. § 12181(7)(F). Accordingly, I would affirm the district court’s judgment.

. Furthermore, the two reasons that Mr. Le-vorsen and the United States offer for why these canons should not be applied here are no more persuasive than the majority's position. First, Mr. Levorsen and the United States point out that the administrative guidance provided by the Department of Justice ("DOJ”) states that the examples provided in § 12181(7) are not "exhaustive” but merely "representative.” 28 C.F.R. pt. 36, app. C, at 893 (2013). The guidance notes that "[t]he category of social service center establishments would include not only the types of establishments listed, day care centers, senior citizen centers, homeless shelters, food banks, adoption agencies, but also establishments such as substance abuse treatment centers, rape crisis centers, and halfway houses.” Id. *1239 The DOJ’s Title III Technical Assistance Manual also states that "the examples given are just illustrations.” U.S. Dep’t of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities § III-1.2000, www.ada.gov/taman3. html (last visited July 7, 2016). While we accord deference to the DOJ’s guidance regarding Title III, see, e.g., Bragdon v. Abbott, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); Colo. Cross Disability Coal. v. Hermanson Family Ltd. P’ship I, 264 F.3d 999, 1004 n.6 (10th Cir. 2001), contrary to the suggestion of Mr. Levorsen and the United States, such guidance does not suggest that we must disregard the examples listed in subsection (7)(F) as touchstones when discerning the scope of the term “service establishments.” To the contrary, the DOJ has made clear that the statutorily enumerated examples are "representative” and "illustrations” of what constitutes a "service establishment” — that is, that the examples possess qualities common to all "service establishments.” See Webster’s Third New International Dictionary 1926 (2002) [hereinafter Webster's] (defining "representative” as, inter alia, “conveying an idea of others of the kind” and "one that in some way corresponds to, replaces, or is equivalent to someone or something else”).
Second, Mr. Levorsen and the United States cite legislative history to suggest that ejusdem generis and noscitur a sociis should not be applied to subsection (7)(F). But, in relying on legislative history, they put the proverbial cart before the horse. As several courts have observed, we only turn to extrinsic sources such as legislative history for illumination after we have been unsuccessful in discerning Congress’s intent from the words of the statute itself — including through the use of canons of statutory interpretation. See, e.g., Carrieri v. Jobs.com Inc., 393 F.3d 508, 518-19 (5th Cir. 2004) (“Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history.” (footnote omitted)); PrimeTime 24 Joint Venture, 245 F.3d at 1225 (noting that "where the meaning of a statute is discernible in light of canons of construction, we should not resort to legislative history or other extrinsic evidence”); see also Circuit City Stores, 532 U.S. at 115, 119, 121 S.Ct. 1302 (applying canons of construction including ejusdem generis to interpret the text of a statute, and then concluding that because the Court’s holding was “directed by the text of [the statute], [the Court] need not assess the legislative history”); PrimeTime 24 Joint Venture, 245 F.3d at 1225 ("Even where the statutory language is not entirely transparent ... the Court has tools at its disposal for elucidating the meaning of a statute without reverting to legislative history. These tools are the canons of construction.”).

. To be more precise, the district court indicated that "in all establishments listed under subsection (F), a common theme is the provision of goods or services to the public, in exchange for money.” Aplt.'s App. at 37 (emphasis added). However, it seems more appropriate and natural to think of “service establishments” as providing some form of “service,” rather than a good, though the delivery of a good may be incidental to the furnishing of a service (e.g., a full-service gas station or a pharmacy). Indeed, there are other provisions of the statute’s “public accommodations” definition that appear to more clearly contemplate the provision of goods, see, e.g., 42 U.S.C. § 12181(7)(E) (defining "public accommodations” to include "a bakery, grocery store, [or] clothing store”), and we do not "lightly” presume that Congress intended any redundancy in enacting subsection (7)(F), United States v. Smith, 756 F.3d 1179, 1187 (10th Cir. 2014) ("Some *1240 times ... legislatures employ redundant language. We don’t doubt that's true but neither are we entitled to reach such a conclusion lightly. Respect for democratic authority requires unelected federal judges to exercise great caution before declaring the words enacted by the people's representatives to be superfluous.” (citation omitted)). In any event, as I see it, the essential' — indeed, determinative — point that the district court sought to convey is that the "common theme” of subsection (7)(F)'s enumerated service establishments is that they provide something to the public in exchange for a fee. And I agree with the district court, as discussed infra, that this is a principal ground of distinction between subsection (7)(F)’s service establishments and plasma-donation centers.

. The same can be said of every other listed example: that is, gas stations, funeral parlors, banks, travel-service businesses, offices of accountants or lawyers, pharmacies, insurance offices, professional offices of healthcare providers, and hospitals.

. Of course some of the entities listed in subsection (7)(F) could conceivably provide the public a "service” in both forms — that is, they could provide the public both expertise and specialized equipment. For example, a gas station might provide the public specialized equipment for obtaining gasoline but also expertise in repairing malfunctioning automobiles. It is reasonable to conclude that, in some circumstances, unenumerated entities that qualify as service establishments under subsection (7)(F) may provide a "service” to the public in both forms as well.

.This understanding of "services” in the context of the examples in subsection (7)(F) is consistent with the common view of the term "service.” As the majority notes, in discerning the ordinary meaning of a term, we generally look to standard dictionaries. See, e.g., In re Hamilton Creek Metro. Dist., 143 F.3d 1381, 1385 (10th Cir. 1998) ("[TJhe ordinary meaning attached to the word ... may be found by aid of commonly accepted dictionary definitions.”). Looking there, as a general matter, "service" means any "conduct or performance that assists or benefits someone or something.” Webster's, supra, at 2075; see also The New Oxford American Dictionary 1549 (2d ed. 2005) [hereinafter Oxford] (defining “service” as, inter alia, "an act of assistance”). A service typically does not produce a tangible good for a customer or client. See Webster’s, supra, at 2075 (defining “service” as, inter alia, "useful labor that does not produce a tangible commodity,” and "providing services rather than tangible goods”); Oxford, supra, at 1549 (defining "service” as, inter alia, "work done for a customer other than manufacturing”). Though they joust about the specific import of subsection (7)(F) with respect to plasma-donation centers, the parties (along with the majority) appear to share this general understanding of the foundational term "service.” See, e.g., Aplt.'s Opening Br. at 13 (“[A] natural reading of the term 'service establishment’ plainly includes any facility, open to the public, where commercial exchange involving an intangible benefit is conducted.” (emphasis added)); Aplee. Br. at 16 ("The most relevant dictionary definition of 'service' is ‘useful labor that does not produce *1241 a tangible commodity.' ” (quoting Merriam-Webster’s Collegiate Dictionary 1070 (10th ed. 1996))).

. Additionally, the majority asserts that applying the well-established canons of construction discussed herein runs afoul of the principle of statutory construction that "counsels against reading ... a direction-of-compensation requirement into the statute when one doesn’t appear there.” Maj. Op. at 1232. In this regard, the majority cites United States v. Sturm, where we cautioned that "[c]ourts must 'ordinarily resist reading words or elements into a statute that do not appear on its face.’ ” 673 F.3d 1274, 1279 (10th Cir. 2012) (quoting Bates v. United States, 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997)). However, relying on canons of construction to glean Congress’s intent from the statute's language is a far cry from reading words into a statute that simply are not there. At all times, in applying these canons, the focus is on the words of the statute and what they convey about Congress’s intent. See, e.g., PrimeTime 24 Joint Venture, 245 F.3d at 1225 (“[T]he canons of construction focus on the text actually approved by Congress and made a part of our country’s laws.”). Congress provided textual examples in subsection (7)(F) that it intended to be illustrative of the meaning of the term "service establishment,” cf. Scalia & Garner, supra, at 61 ("The canons influence not just how courts approach texts but also the techniques that legal drafters follow in preparing those texts.”), and those examples indicate that in order to be a "service establishment,” an entity must receive compensation from the public for services rendered. Furthermore, unlike the defendant in Sturm, I do not contend that Congress omitted the compensation component through some "scrivener's error” and that we should now correct that "error” by reading that component back into the statute. See Sturm, 673 F.3d at 1278-79. Instead, I main *1242 tain that the plain terms that Congress provided us in subsection (7)(F) are imbued with the compensation component and applying canons of construction makes this patent. See Chickasaw Nation, 534 U.S. at 94, 122 S.Ct. 528 (canons of construction are "designed to help judges determine the Legislature’s intent as embodied in particular statutory language.” (emphasis added)). There is no language that needs to be added.

. The district court suggested that plasma donors like Mr. Levorsen may be viewed as providing a service to plasma-donation centers like Octapharma. In this regard, it observed that "it is the plasma donation center that offers money to a member of the public in exchange for a service to the center — the donation of plasma.” Aplt.'s App. at 37. However, as noted infra in Part I.B, plasma-donation centers actually resemble manufacturers much more than they do the typical business under subsection (7)(F) that provides services to the public, and thus it is probably closer to the truth to say that Mr. Levorsen is providing a commodity for Octapharma’s manufacturing process. Indeed, in his complaint, Mr. Levorsen avers that the plasma that he donates is "used as source material for further manufacturing use.” Aplt.’s App. at 8. However, for purposes of analyzing the plain terms of the statute, the proper characterization of the donor’s action as providing a commodity or service is immaterial. Rather, the important point is that — irrespective of whether Mr. Levorsen (and other donors) provided Octap-harma a commodity or a service — in exchange, he received a fee from Octapharma, whereas, in contrast, all of the service establishments listed in subsection (7)(F) received a fee from the public for their service, rather than paying one. Therefore, in my view, Oc-tapharma's business practice of paying plasma donors does not fit the paradigm of service establishments described in subsection am.

. To be sure, Mr. Levorsen receives a fee for his plasma donation, and the complaint’s averments indicate that he clearly desires such payments. But such fees cannot be the desired end of the service under subsection (7)(F) because the statute contemplates that the service establishment will provide the service to the public in exchange for a fee that it receives; the statute does not envision that a member of the public will receive from the service establishment both the service and the fee. In other words, viewed through the prism of subsection (7)(F), the fee cannot be the desired end that the public seeks to achieve from the plasma-donation centers because the statute contemplates that it is the service establishment that will receive the fee in exchange for providing the desired end.

. See generally Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1022 (D.C. Cir. 1978) ("To make paper from trees is an old art .... In paper-making, logs or wooden chips must be ground up or ‘cooked’ in one of several processes until only cellulose pulp is left. The pulp is bleached and made into various types and grades of paper.”); Christopher D. Knopf, Closing the Loop: Requiring Double-Sided Copying and Non-Chlorine Bleached Recycled Paper for Federal Court Papers, 1995 WIS. L. REV. 345, 356 ("Paper mills typically produce paper from wood by first stripping bark from logs and grinding these stripped logs into chips.”).