**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BRENT LEVORSEN,

     Plaintiff - Appellant,

v.

OCTAPHARMA PLASMA, INC.,

     Defendant - Appellee.

_____

UNITED STATES OF AMERICA;
PLASMA PROTEIN THERAPEUTICS
ASSOCIATION,

     Amici Curiae.

No. 14-4162

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:14-CV-00325-DBP)**
_____

Ryan C. Downer, Relman, Dane & Colfax PLLC, Washington, D. C. (Sasha Samberg-Champion and Michael Allen, Relman, Dane & Colfax PLLC, Washington, D. C., and Aaron M. Kinikini Disability Law Center, Salt Lake City, Utah, with him on the briefs), for Plaintiff-Appellant.

Cary B. Davis, Robinson Bradshaw & Hinson, P.A., Charlotte, N.C. (Charles E. Johnson, Robinson Bradshaw & Hinson, P.A., Charlotte, N.C., and Lisa A. Yerkovich, and Liesel Brand Stevens, Ray Quinney & Nebeker, Salt Lake City, Utah, with her on the brief), for Defendant-Appellee.

Nathaniel S. Pollock, U.S. Department of Justice, Washington, D.C., (Vanita Gupta, Principal Deputy Assistant Attorney General, and Tovah R. Calderon, U.S. Department

of Justice, Washington, D.C., with him on the brief) for United States of America, Amicus Curiae.

Joshua Penrod and John T. Delacourt, Plasma Protein Therapeutics Association, Washington, D. C.; Joseph A. Boyle, Kelley Drye & Warren, LLP, Parsippany, New Jersey, filed a brief for Plasma Protein Therapeutics Association, Amicus Curiae.

_____

Before **BRISCOE**, **HOLMES**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Some statutes are so "enigmatic" that we must resort to diagraming their clauses in an effort to discern their meanings. *See, e.g.*, *United States v. Rentz*, 777 F.3d 1105, 1106, 1109 (10th Cir. 2015) (parsing 18 U.S.C. § 924(c)(1)(A)'s "bramble of prepositional phrases"). Others are so abstruse that we must employ canons of statutory interpretation to define their terms. *See, e.g.*, *United States v. Brune*, 767 F.3d 1009, 1022-23 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 1469 (2015) (applying canon of *ejusdem generis* to 18 U.S.C. § 2252A(a)(5)(B)). Still others are so ambiguous that we must comb the annals of legislative history to divine Congress' intent. *See, e.g.*, *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1265-66 (10th Cir. 2014) (examining legislative history because meaning of 28 U.S.C. § 1332(d)(4)(A) wasn't apparent from its plain language).

But the statute we are tasked with interpreting here, 42 U.S.C. § 12181(7)(F), isn't one of those statutes. Section 12181(7)(F) makes "service establishments" public accommodations for purposes of Title III of the Americans with Disabilities

2

Act (ADA). Title III, in turn, generally prohibits public accommodations from discriminating against individuals on the basis of disability. *See* 42 U.S.C. § 12182(a). Here, the district court[1] concluded that plasma-donation centers (PDCs) aren't service establishments because, unlike § 12181(7)(F)'s enumerated examples, PDCs don't provide a service to the public in exchange for a fee.

We find this superficial distinction irrelevant. Under the plain language of § 12181(7)(F), a PDC is a "service establishment" for two exceedingly simple reasons: It's an establishment. And it provides a service. This straightforward conclusion is entirely consistent with the goal and purpose of Title III. Thus, we need not look beyond the plain language of § 12181(7)(F) to determine that a PDC constitutes a public accommodation. Because the district court erred in concluding otherwise—and in dismissing the underlying action on that basis—we reverse and remand for further proceedings.

## BACKGROUND

Brent Levorsen suffers from various psychiatric disorders, including borderline schizophrenia.[2] For years, Levorsen has donated plasma in exchange for money in an effort to supplement his limited income. And in May 2013, he attempted to do just that at a Salt Lake City branch of Octapharma Plasma, Inc.

---

[1] A magistrate judge heard the case upon the parties' consent. *See* Fed. R. Civ. P. 73.

[2] We take the bulk of these facts from Levorsen's complaint. *See Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (noting that we accept the complaint's well-pleaded factual allegations as true at motion-to-dismiss stage).

3

Octapharma operates multiple PDCs, including the one at issue in this case. At those facilities, Octapharma collects donors' plasma using a process called plasmapheresis. During that process, Octapharma draws and mechanically processes each donor's blood, separating and reserving the plasma before returning the red blood cells to the donor. Octapharma pays its donors for this plasma, which it then sells to pharmaceutical companies.

When an Octapharma employee learned that Levorsen suffers from borderline schizophrenia, the employee became concerned that Levorsen might have a schizophrenic episode while donating and dislodge the collecting needle, possibly injuring himself or someone else. The employee thus advised Levorsen that he was ineligible to donate plasma. Levorsen then provided Octapharma with a signed form from his psychiatrists, who both indicated that Levorsen is medically suitable to donate plasma twice a week. When Octapharma maintained its refusal to allow Levorsen to donate, he brought this action under Title III of the ADA.

Title III generally prohibits public accommodations from discriminating against individuals on the basis of disability. § 12182(a). For purposes of Title III, "service establishment[s]" constitute public accommodations. § 12181(7)(F). In his complaint, Levorsen alleged that PDCs like Octapharma are public accommodations because they are service establishments. And he maintained that when it denied him the opportunity to donate plasma in exchange for payment based solely on his borderline schizophrenia, Octapharma impermissibly discriminated against him on the basis of his disability in violation of Title III of the ADA.

4

Octapharma moved to dismiss under Fed. R. Civ. P. 12(b)(6). Octapharma didn't dispute that Levorsen's borderline schizophrenia constitutes a disability for purposes of Title III. Nor did it dispute that Octapharma prohibited Levorsen from donating plasma based on that disability. Instead, it argued only that PDCs like Octapharma are not public accommodations for purposes of Title III. More specifically, Octapharma argued that PDCs are not service establishments because—unlike § 12181(7)(F)'s enumerated entities—PDCs don't provide a service to the public in exchange for a fee.

The district court agreed. It reasoned that rather than accepting payment *from* the public in exchange for a service that PDCs provide, PDCs instead offer payment *to* the public in exchange for a service that PDCs receive. And because PDCs differ from § 12181(7)(F)'s enumerated entities in that regard, the district court concluded that PDCs are not service establishments. Consequently, it ruled, PDCs are not public accommodations for purposes of Title III.[3]

Based on this conclusion, the district court granted Octapharma's Rule 12(b)(6) motion and dismissed the action with prejudice. Levorsen appeals.

**DISCUSSION**

"Congress enacted the ADA in 1990 to remedy widespread discrimination

---

[3] The district court also rejected Levorsen's argument that Octapharma constitutes a "professional office of a health care provider" under § 12181(7)(F). Because Levorsen has abandoned this argument on appeal, we need not address it. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

5

against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). To that end, § 12182(a) prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." And § 12181(7)(F) clarifies that, among other entities, the following "are considered public accommodations": "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment."

Section 12181(7)(F)'s enumerated examples aren't exhaustive, *see* 28 C.F.R. pt. 36, app. C, at 893; rather, they serve as mere illustrations, *see* U.S. Dep't of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* § III-1.2000, www.ada.gov/taman3.html (last visited June 29, 2016). Moreover, courts must construe § 12181(7)(F) liberally to afford individuals with disabilities access to the same establishments available to those without disabilities. *PGA Tour*, 532 U.S. at 676-77; *see also Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 983 (10th Cir. 2002) ("In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end." (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 262 (10th Cir. 1987))).

Citing these dictates, Levorsen argues that the district court erred in failing to liberally construe the term "service establishment" to encompass PDCs. According to

6

Levorsen, the district court unnecessarily employed canons of statutory interpretation and impermissibly read into § 12181(7)(F) language that doesn't appear there. As a result, Levorsen asserts, the district court arrived at an unacceptably narrow definition of "service establishment." Instead, Levorsen argues, the district court should have given the term "service establishment" its plain meaning and defined it as an establishment that provides a service. And because PDCs unquestionably satisfy this definition, he concludes, they constitute public accommodations for purposes of Title III.

Exercising de novo review, *see Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), we agree.

We begin, as we must, with the plain language of § 12181(7)(F). *See St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000) ("As in all cases requiring statutory construction, 'we begin with the plain language of the law.'" (quoting *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991))). Under § 12181(7)(F), a "service establishment" is a public accommodation for purposes of Title III. Thus, the question before us is whether, under the plain language of § 12181(7)(F), a PDC like Octapharma is a service establishment.

An establishment is a "place of business" or "a public or private institution ([such] as a school or hospital)." *Webster's Third New International Dictionary* 778 (2002) [hereinafter *Webster's*]. And a service is "conduct or performance that assists or benefits someone or something," or "useful labor that does not produce a tangible commodity." *Id.* at 2075. Accordingly, we conclude that a service establishment is a

7

place of business or a public or private institution that, by its conduct or performance, assists or benefits someone or something or provides useful labor without producing a tangible good for a customer or client. *See Brune*, 767 F.3d at 1022 (suggesting that in "many instances, simply resorting to a dictionary definition" of a statute's terms may be "helpful")[4]; *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998) (noting that words' ordinary meanings "may be found by aid of commonly accepted dictionary definitions"). In other words, a service establishment is—unsurprisingly—an establishment that provides a service.

Octapharma resists this straightforward conclusion. It insists that rather than simply combining the ordinary meanings of the terms "service" and "establishment," we must instead apply two canons of statutory interpretation: *ejusdem generis* and *noscitur a sociis*. These canons counsel, respectively, that (1) "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration," *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991), and (2) "a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961).

---

[4] The dissent cites *Brune* as an example of a case in which we looked beyond the dictionary definition of the term at issue to canons of statutory construction. *See* Dissent 6. But we did so only because that term's multiple dictionary definitions "preclude[d] an obvious, unitary usage." *Brune*, 767 F.3d at 1022. Here, on the other hand, everyone seems to agree on "an obvious, unitary" definition of the term "service." *Id.*; *see* Aplt. Br. 13; Aplee. Br. 16; Dissent 12 n.5. And neither Octapharma nor the dissent offers a definition of "establishment" that is at odds with the one we arrive at here. Thus, we find *Brune* distinguishable.

8

As the district court pointed out below, the specific entities listed in § 12181(7)(F)—laundromats, dry-cleaners, banks, barber shops, beauty shops, travel services, shoe repair services, funeral parlors, gas stations, lawyers' offices, accountants' offices, pharmacies, insurance offices, health care providers' professional offices, and hospitals—happen to share at least one common trait: each traditionally receives some form of payment from its customers, rather than providing one to them. Thus, Octapharma reasons, Congress' choice to employ these specific terms necessarily restricts the meaning of the more general term "service establishment" to other entities that also share this same characteristic.

But giving the term "service establishment" its ordinary meaning (i.e., an establishment that provides a service) yields neither ambiguity nor an irrational result. *See Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir. 1986) ("It is a well[-]established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls."). In fact, giving the term its ordinary meaning achieves just the opposite: it yields a broad definition that is entirely consistent with Title III's aim of affording individuals with disabilities access to the same establishments available to those without disabilities. *See PGA Tour*, 532 U.S. at 676-77.

Under these circumstances, we won't bend over backwards to give the term "service establishment" a definition that is more narrow than the plain meaning of its component parts. In fact, such interpretative gymnastics are not only unnecessary here, they're inappropriate given our duty to liberally construe § 12181(7)(F). *See id.* Accordingly, we decline to apply *ejusdem generis* and *noscitur a sociis*. Instead, we

9

begin and end with the plain meaning of the words that Congress employed. A service establishment is an "establishment" that provides a "service" as we define those terms above. *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014) ("[I]f the statutory language is clear, our analysis ordinarily ends." (quoting *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1245 (10th Cir. 2009))); *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001)[5] (explaining that "clear language of a statutory provision holds a status above that of any other canon of construction, and often vitiates the need to consider any of the other canons").

In any event, even if giving the phrase "service establishment" its ordinary meaning *did* result in a definition we found to be ambiguous or irrational, employing the canons of statutory interpretation that Octapharma cites wouldn't clarify matters. True, applying *ejusdem generis* and *noscitur a sociis* might indicate that we should refrain from treating PDCs as service establishments because—unlike § 12181(7)(F)'s enumerated examples—they provide compensation to, rather than accept compensation from, their customers. However, another rule of statutory interpretation counsels against reading such a direction-of-compensation requirement into the statute when one doesn't appear there. *See United States v. Sturm*, 673 F.3d

---

[5] The dissent quotes the Eleventh Circuit's decision in *CBS Inc.* to bolster its assertion that "canons of statutory construction are aids in construing the language itself—not tools to be relied on only in the face of ambiguity." Dissent 6-7. But as the Eleventh Circuit made clear in a footnote, a statute's plain language "often vitiates" any need to resort to the canons in the first place. *CBS Inc.*, 245 F.3d at 1225 n.6. That is exactly the case here. Section 12181(7)(F)'s plain language "vitiates" any need to apply *ejusdem generis* or *noscitur a sociis*. *Id.*

10

1274, 1279 (10th Cir. 2012) (noting that we "must 'ordinarily resist reading words or elements into a statute that do not appear on its face.'" (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997))); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001)[6] ("Specific canons 'are often countered . . . by some maxim pointing in a different direction.'" (alteration in original) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001))). In light of these contradictory suggestions, we think that looking beyond the plain language of the statute would serve only to manufacture ambiguity where none exists.

But if we had to resolve that manufactured ambiguity, we would next examine the legislative history. *See United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002). Here, that history bolsters our decision to refrain from concluding that an entity is a service establishment only if it is "similar" to § 12181(7)(F)'s enumerated examples. *See, e.g.*, H.R. Rep. No. 101–485, pt. 3, at 54 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 445, 477 (explaining that "[a] person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the

---

[6] The dissent cites *Chickasaw Nation* for the proposition that we should employ the canons to discern § 12181(7)(F)'s plain meaning. Dissent 5. But notably, *Chickasaw Nation* ultimately declined to apply the canons upon which the petitioner relied, in part because the application of those canons "would produce an interpretation [of the statute at issue] that . . . would conflict with the intent embodied in the statute Congress wrote." 534 U.S. at 94 (noting that "canons are not mandatory rules"). Given our duty to construe § 12181(7)(F) liberally to afford individuals with disabilities access to the same establishments available to those without disabilities, *see PGA Tour*, 532 U.S. at 676-77, applying *ejusdem generis* and *noscitur a sociis* in this case would produce the same result. Accordingly, *Chickasaw Nation* only lends further support to our decision to refrain from applying these canons.

11

examples listed in the definition"; instead, he or she need only "show that the entity falls within the overall category"). In fact, Congress changed the language in § 12181(7)(F) from "other *similar* service establishments" to "other service establishments," presumably to make clear that a particular business need *not* be similar to the enumerated examples to constitute a service establishment.[7] *Compare* H.R. Rep. No. 101-485, pt. 4, at 56 (1990) (emphasis added), *as reprinted in* 1990 U.S.C.C.A.N. 512, 545, *with* § 12181(7)(F). *Cf.* 136 Cong. Rec. 11,472 (1990) (explaining, with reference to 42 U.S.C. § 12181(7)(E), that one of the changes "adopted in the final bill . . . was to delete the word 'similar'" so that "a person alleging discrimination does not have to prove that a particular business is similar to one of the businesses listed . . . but rather, that the business falls within the general category described").

So whether we confine our analysis to, or extend our analysis beyond, the plain language of § 12181(7)(F), the result is the same: service establishments are

---

[7] The dissent purports to explain why it can ignore this legislative history, noting that "we only turn to extrinsic sources such as legislative history for illumination after we have been unsuccessful in discerning Congress's intent from the words of the statute itself—including through the use of canons of statutory interpretation." Dissent 9 n.1. We wholeheartedly agree with the dissent that examining the legislative history is unnecessary in this case, albeit for the same reasons that we also find it unnecessary to apply the canons. But even if we assume that we must apply the canons, the result of that application is so ambiguous as to require us to examine the legislative history as well. And that history makes it abundantly clear that the dissent's approach does precisely what Congress warned against doing: it reads a similarity requirement into § 12181(7)(F)'s "other service establishment" clause. *See* Dissent 10-18.

12

establishments that provide a service, regardless of whether they provide or accept compensation as part of that process.

The only remaining question before us is whether PDCs like Octapharma satisfy that definition. We conclude that they do. PDCs like Octapharma are "place[s] of business." *Webster's*, *supra*, at 778. And they "assist[] or benefit[]" those who wish to provide plasma for medical use—whether for altruistic reasons or for pecuniary gain—by supplying the trained personnel and medical equipment necessary to accomplish that goal. *Id.* at 2075. Finally, while PDCs may ultimately "produce a tangible good"[8] for pharmaceutical companies in the form of plasma, they don't "produce a tangible good" for individuals like Levorsen, who seek to use their plasma-procurement services. *Id.* Rather, PDCs simply "assist[]" those individuals in accomplishing their goal of providing plasma. *Id.* Accordingly, we conclude that PDCs like Octapharma are service

---

[8] Both the dissent and Octapharma characterize PDCs as manufacturers. *See* Dissent 18-20; Aplee. Br., 13-19. But neither provides any authority establishing that an entity can't simultaneously be both a manufacturer and a service establishment for purposes of § 12181(7)(F), especially if—as is the case here—that entity provides a service to some customers while producing a tangible good for others. In fact, Octapharma implicitly acknowledges that entities can simultaneously perform different functions for different customers or clients. *See* Aplee. Br. 15 n.6 (characterizing pawn shops and used record stores as "sales establishments" for purposes of § 12181(7)(E) because, while these entities buy goods from some members of the public, they sell goods to others). Moreover, we question the dissent's likening of PDCs to paper mills. *See* Dissent 19. Unlike PDCs, paper mills don't typically hold themselves open as accepting source product from individual members of the public. PDCs, on the other hand, are public-facing businesses. Given the ADA's goal of affording individuals with disabilities access to the same establishments available to those without disabilities, *see PGA Tour*, 532 U.S. at 676-77, this is a relevant distinction.

13

establishments under § 12181(7)(F). And because they are service establishments under § 12181(7)(F), they are public accommodations for purposes of Title III.[9]

## CONCLUSION

Because Octapharma is an establishment that provides a service, it is a service establishment under the plain language of § 12181(7)(F). And even if that weren't unambiguously the case, the relevant legislative history and our duty to liberally construe the statute would lead us to the same conclusion.

Octapharma is a public accommodation for purpose of Title III. Because the district court erred in finding otherwise and in dismissing the action on that basis, we reverse and remand for further proceedings.

---

[9] Octapharma insists this conclusion will put PDCs in an untenable position by creating a conflict between the ADA and certain regulations promulgated by the Food and Drug Administration. *See, e.g.*, 21 C.F.R. § 606.100(b)(1) (requiring PDCs to establish "[c]riteria used to determine donor eligibility, including acceptable medical history criteria"); 21 C.F.R. § 630.10(a) (noting that PDCs must determine donor eligibility, and that donors aren't eligible if "not in good health" or if PDC identifies "factor(s) that may cause the donation to adversely affect" a  donor's health or the "safety, purity, or potency of the blood or blood component"). We find this argument unavailing. As the United States as amicus curiae points out, the Department of Justice's Title III regulations explicitly allow public accommodations to "impose legitimate safety requirements that are necessary for safe operation," as long as those requirements are "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." U.S. Reply Br. 3 (quoting 28 C.F.R. § 36.301(b)). In any event, we do not hold today that Octapharma must allow Levorsen to donate plasma. Nor do we take a position on whether Octapharma unlawfully discriminated against Levorsen under § 12182(a). We hold only that Levorsen *has access* to Octapharma as a public accommodation. Thus, we reject Octapharma's suggestion that our holding is fundamentally irreconcilable with the FDA regulations governing PDCs.

14

No. 14-4162, *Levorsen v. Octapharma Plasma, Inc.*

**HOLMES**, Circuit Judge, dissenting.

I respectfully dissent.  The sole question on appeal is whether a plasma-donation center constitutes a "service establishment" within the meaning of 42 U.S.C. § 12181(7)(F).  In contrast to the majority, I do not believe that such centers fall within the ambit of the term "service establishment."  Therefore, I would affirm the district court's judgment.

**I**

**A**

In 42 U.S.C. § 12181(7)(F), Congress identified a category of "private entities [that] are considered public accommodations"—i.e., service establishments—under Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213.  Congress enumerated the category as follows: "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or *other service establishment*."  42 U.S.C. § 12181(7)(F) (emphasis added).

We construe Title III with its broad remedial purpose in mind.  *See, e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (discussing the "broad mandate," "comprehensive character," and "sweeping purpose" of the ADA in "eliminat[ing] discrimination against disabled individuals[] and . . . integrat[ing] them 'into the economic and social mainstream of American life.'" (citations omitted)); *id.* at 676

(stating that Title III's legislative history indicates that the categories of "public accommodation[s]" "should be construed liberally" (citation omitted)); *see also Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 983 (10th Cir. 2002) ("In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end." (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 262 (10th Cir. 1987))); *Butler v. City of Prairie Vill.*, 172 F.3d 736, 744 (10th Cir. 1999) (noting that "the ADA's remedial purposes are broad and far-reaching"). Nevertheless, I would conclude that a plasma-donation center is not a "service establishment" within the meaning of § 12181(7)(F).

More specifically, I would conclude that the district court correctly ruled—by reference to the examples of service establishments listed in § 12181(7)(F)—that service establishments offer certain services in exchange for monetary compensation (i.e., a fee). Going further, in my view, every service establishment listed in § 12181(7)(F) shares some key unifying traits: they offer the public a "service" (1) in the form of (a) expertise (e.g., barbers, beauticians, shoe-repair craftsman, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, pharmacists, health care providers, and hospitals) or (b) specialized equipment (e.g., laundromats and gas stations), (2) for use in achieving some desired end, (3) in exchange for monetary compensation.

With the foregoing considerations in mind, it becomes clear that plasma-donation centers are not service establishments within the meaning of subsection (7)(F). First, plasma-donation centers do not receive a fee from members of the public in exchange for

2

any services that they provide. Second, to the extent that plasma-donation centers provide services to the public, they do not do so for the public's use in achieving a desired end; instead, they provide them for *the centers'* use in achieving a desired end—the collection of plasma for sale to pharmaceutical companies. For these two principal reasons, plasma-donation centers are fundamentally unlike the service establishments listed in 42 U.S.C. § 12181(7)(F), and I would conclude that they do not fall within the scope of that statute. Consequently, plasma-donation centers do not qualify as public accommodations under Title III of the ADA, and the district court therefore did not err in dismissing Mr. Levorsen's complaint.

## 1

"[O]ur primary task in interpreting statutes [is] to determine congressional intent," and the starting point for discerning congressional intent is the plain language of the statute. *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1245 (10th Cir. 2009) (per curiam) (quoting *Russell v. United States*, 551 F.3d 1174, 1178 (10th Cir. 2008)); *see United States v. West*, 671 F.3d 1195, 1199 (10th Cir. 2012) (stating that "we first and foremost look to the statute's language to ascertain Congressional intent"). If the statute's language is clear, our analysis comes to an end. *See, e.g.*, *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014); *United States v. Sprenger*, 625 F.3d 1305, 1307 (10th Cir. 2010); *Coffey*, 581 F.3d at 1245. That is, if the statute is unambiguous, we need not "resort . . . to the statutory history" or other extrinsic sources. *Wyodak Res. Dev. Corp. v. United States*, 637 F.3d 1127, 1135 (10th Cir. 2011); *see also* Antonin

3

Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("[T]he purpose [of a statute] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."). In fact, "[w]e will look beyond the plain language of a statute *only* if the result is an absurd application of the law." *United States v. Brown*, 529 F.3d 1260, 1265 (10th Cir. 2008).

We do not, however, construe statutory terms in isolation. *See, e.g.*, *McDonnell v. United States*, --- S. Ct. ----, 2016 WL 3461561, at*13 (June 27, 2016) ("To choose between those competing definitions, we look to the context in which the words appear."); *United States v. Brune*, 767 F.3d 1009, 1022 (10th Cir. 2014) ("[N]o statute is an island unto itself. We can look around to provide substance and context to a potentially unclear term."); *see also Brune*, 767 F.3d at 1022–23 ("[W]e are required to construe a phrase within a statute with reference to its accompanying words 'in order to avoid the giving of unintended breadth to the Acts of Congress.'" (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961))). Indeed, "the meaning of statutory language, plain or not, depends on context." *First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 694 (10th Cir. 2014) (quoting *United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009)); *see also Villa*, 589 F.3d at 1343 (observing that, in order to give the language of a statute its "most natural reading," we "consider not only the bare meaning of the [text] but also its placement and purpose in the statutory scheme" (alteration in original) (citations omitted)). Thus, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language

4

is used, and the broader context of the statute as a whole." *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1137 (10th Cir. 2011) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Furthermore, in interpreting the plain meaning of statutory terms, courts frequently use various canons of interpretation "designed to help judges determine the Legislature's intent as embodied in particular statutory language." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Two canons, *ejusdem generis* and *noscitur a sociis*, are particularly relevant for interpreting § 12181(7)(F)'s statutory language. Under the *ejusdem generis* canon, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991)). The interpretive canon *noscitur a sociis* similarly counsels that "a word is known by the company it keeps," *id.* at 226 (quoting *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006))—i.e., the word "may be 'given more precise content by the neighboring words with which it is associated,'" *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)); *see also United States v. Phillips*, 543 F.3d 1197, 1206 (10th Cir. 2008) ("Under the venerable interpretive canons of *noscitur a sociis* and *ejusdem generis*, the meaning of a catchall phrase is given precise content by the specific terms that precede it.").

**2**

At issue in this case is subsection (7)(F); it includes in the definition of "public accommodations": "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, *or other service establishment*." 42 U.S.C. § 12181(7)(F) (emphasis added). The district court sought to derive a "common theme" from the enumerated examples, and concluded that they all involve "the provision of goods or services to the public, in exchange for money." Aplt.'s App. at 37. In effect, the court applied the *ejusdem generis* and *noscitur a sociis* canons.

The majority concludes that the district court erred in applying these canons because the ordinary meaning of the statutory language is clear. This conclusion, however, overlooks the key principle that such canons of statutory construction are aids in construing the language itself—not tools to be relied on only in the face of ambiguity. *See McDonnell*, 2016 WL 3461561, at *13–14 (applying the *noscitur a sociis* canon to an unambiguous statute in giving it a "more limited reading"); *Chickasaw Nation*, 534 U.S. at 94 (stating that canons of construction are "designed to help judges determine the Legislature's intent *as embodied in particular statutory language*" (emphasis added)); *Brune*, 767 F.3d at 1022–23 (stating that "simply resorting to a dictionary definition in this case is not especially helpful" because "[t]he multiple definitions of [the residual phrase at issue] preclude an obvious, unitary usage," but "the wording of the statute

6

invites the application of the canon of construction of *ejusdem generis*[] [because] 'general words follow specific words in a statutory enumeration . . .'" (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114 (2001))); *CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001) ("[T]he canons of construction focus on the text actually approved by Congress and made a part of our country's laws. . . . Canons of construction are essentially tools which help us to determine whether the meaning of a statutory provision is sufficiently plain, in light of the text of the statute as a whole, to avoid the need to consider extrinsic evidence of Congress' intent." (footnote omitted)); *cf. In re Woods*, 743 F.3d at 694 ("[T]he meaning of statutory language, plain or not, depends on context." (quoting *Villa*, 589 F.3d at 1343)). Thus, the consideration of interpretative canons is not a step beyond a plain-meaning analysis; instead, as here, it can be part and parcel of such an analysis and complement any reliance on dictionary definitions of the relevant terms.

Indeed, the single case the majority cites in support of its assertion that resort to canons of construction is appropriate only in the face of an ambiguity or an irrational result does little to advance that position. In *Edwards v. Valdez,* our court made the unremarkable point that courts should look to *legislative history* only when faced with a statutory ambiguity. *See* 789 F.2d 1477, 1481 (10th Cir. 1986) ("[A]bsent ambiguity or irrational result, the literal language of a statute controls. When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent." (citation omitted)). This case makes no mention of

7

interpretive canons, nor does it in any way suggest that consideration of such canons amounts to a departure from a plain-meaning analysis of a statute. I thus must disagree with the majority's assumption that the canons that the district court implicitly invoked have no role to play in the present analysis absent a statutory ambiguity or irrational result; rather, these canons are directly relevant to our plain-meaning analysis.

Furthermore, the majority's suggestion that applying these canons here amounts to "interpretative gymnastics . . . [that are] inappropriate given our duty to liberally construe § 12181(7)(F)" is misguided. Maj. Op. at 9. Though we construe statutes like Title III of the ADA liberally to effectuate their remedial purposes, *see, e.g.*, *PGA Tour*, 532 U.S. at 676, that does not mean that we "extend[]" the relevant language "beyond the just and ordinary sense of the terms," 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 429, at 412 (Fred B. Rothman & Co. 1991) (1833) ("Where a power is remedial in its nature, there is much reason to contend, that it ought to be construed liberally. . . . But this liberality of exposition is clearly inadmissible, if it extends beyond the just and ordinary sense of the terms."); *see Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 241 (D.C. Cir. 1981) ("The fact that legislation has a remedial purpose, however, does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress."); *see also* Scalia & Garner, *supra*, at 364 (citing the COMMENTARIES and criticizing the so-called "remedial-statute rule"). And the weight of authority cited above makes clear that "venerable interpretive cannons" like *ejusdem generis* and *noscitur a sociis* are useful and

8

proper tools to employ in discerning the just and ordinary sense of a statute's terms.

*Phillips*, 543 F.3d at 1206.

In short, I would conclude that the district court's decision to apply, at least tacitly, the canons of *ejusdem generis* and *noscitur a sociis* was not erroneous.[1]

_____

[1]     Furthermore, the two reasons that Mr. Levorsen and the United States offer for why these canons should not be applied here are no more persuasive than the majority's position.  First, Mr. Levorsen and the United States point out that the administrative guidance provided by the Department of Justice ("DOJ") states that the examples provided in § 12181(7) are not "exhaustive" but merely "representative."  28 C.F.R. pt. 36, app. C, at 893 (2013).  The guidance notes that "[t]he category of social service center establishments would include not only the types of establishments listed, day care centers, senior citizen centers, homeless shelters, food banks, adoption agencies, but also establishments such as substance abuse treatment centers, rape crisis centers, and halfway houses."  *Id.*  The DOJ's Title III Technical Assistance Manual also states that "the examples given are just illustrations."  U.S. Dep't of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities § III-1.2000, www.ada.gov/taman3.html (last visited July 7, 2016).  While we accord deference to the DOJ's guidance regarding Title III, *see, e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998); *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999, 1004 n.6 (10th Cir. 2001), contrary to the suggestion of Mr. Levorsen and the United States, such guidance does not suggest that we must disregard the examples listed in subsection (7)(F) as touchstones when discerning the scope of the term "service establishments."  To the contrary, the DOJ has made clear that the statutorily enumerated examples are "representative" and "illustrations" of what constitutes a "service establishment"—that is, that the examples possess qualities common to all "service establishments."  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1926 (2002) [hereinafter WEBSTER'S] (defining "representative" as, *inter alia*, "conveying an idea of others of the kind" and "one that in some way corresponds to, replaces, or is equivalent to someone or something else").

Second, Mr. Levorsen and the United States cite legislative history to suggest that *ejusdem generis* and *noscitur a sociis* should not be applied to subsection (7)(F).  But, in relying on legislative history, they put the proverbial cart before the horse.  As several courts have observed, we only turn to extrinsic sources such as legislative history for illumination after we have been unsuccessful in discerning Congress's intent from the words of the statute itself—including through the use of canons of statutory

Moreover, this conclusion is bolstered by the recognition that several of our sister circuits have used *noscitur a sociis* in interpreting § 12181(7). *See, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 614 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc). In my view, therefore, these canons are helpful to the inquiry called for here, and I resort to them.

**3**

Having reviewed the examples listed in § 12181(7)(F) with the benefit of the foregoing interpretive canons, I agree with the district court that service establishments offer services to the public in exchange for compensation.[2] Every service establishment

---

interpretation. *See, e.g.*, *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 518–19 (5th Cir. 2004) ("Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history." (footnote omitted)); *PrimeTime 24 Joint Venture*, 245 F.3d at 1225 (noting that "where the meaning of a statute is discernible in light of canons of construction, we should not resort to legislative history or other extrinsic evidence"); *see also Circuit City Stores*, 532 U.S. at 115, 119 (applying canons of construction including *ejusdem generis* to interpret the text of a statute, and then concluding that because the Court's holding was "directed by the text of [the statute], [the Court] need not assess the legislative history"); *PrimeTime 24 Joint Venture*, 245 F.3d at 1225 ("Even where the statutory language is not entirely transparent . . . the Court has tools at its disposal for elucidating the meaning of a statute without reverting to legislative history. These tools are the canons of construction.").

[2] To be more precise, the district court indicated that "in all establishments listed under subsection (F), a common theme is the provision of *goods* or services to the public, in exchange for money." Aplt.'s App. at 37 (emphasis added). However, it seems more appropriate and natural to think of "service establishments" as providing some form of "service," rather than a good, though the delivery of a good may be incidental to the furnishing of a service (e.g., a full-service gas station or a pharmacy). Indeed, there are other provisions of the statute's "public accommodations" definition that appear to more

10

listed in that subsection offers a service to the public in exchange for compensation: laundromats and dry cleaners offer services involving the cleaning of clothes in exchange for a fee, barbers and beauticians offer to cut and style hair in exchange for a fee, shoe-repair businesses offer to repair shoes in exchange for a fee, and so on.[3]  Therefore, I would conclude that service establishments offer services to the public in exchange for a fee (i.e., monetary compensation).

The district court did not expressly opine on the kinds of "services" that the statute contemplates.  Undertaking a de novo study of the examples listed in subsection (7)(F), however, offers some discernable clues.  Specifically, every service establishment listed in subsection (7)(F) provides the public a "service" in the form of (1) expertise (e.g., barbers, beauticians, shoe-repair businesses, dry cleaners, funeral parlors, lawyers,

---

clearly contemplate the provision of goods, *see, e.g.*, 42 U.S.C. § 12181(7)(E) (defining "public accommodations" to include "a bakery, grocery store, [or] clothing store"), and we do not "lightly" presume that Congress intended any redundancy in enacting subsection (7)(F), *United States v. Smith*, 756 F.3d 1179, 1187 (10th Cir. 2014) ("Sometimes . . . legislatures employ redundant language.  We don't doubt that's true but neither are we entitled to reach such a conclusion lightly.  Respect for democratic authority requires unelected federal judges to exercise great caution before declaring the words enacted by the people's representatives to be superfluous." (citation omitted)).  In any event, as I see it, the essential—indeed, determinative—point that the district court sought to convey is that the "common theme" of subsection (7)(F)'s enumerated service establishments is that they provide something to the public *in exchange for a fee*.  And I agree with the district court, as discussed *infra*, that this is a principal ground of distinction between subsection (7)(F)'s service establishments and plasma-donation centers.

[3]     The same can be said of every other listed example: that is, gas stations, funeral parlors, banks, travel-service businesses, offices of accountants or lawyers, pharmacies, insurance offices, professional offices of healthcare providers, and hospitals.

11

accountants, insurance offices, health care providers, and hospitals), or (2) specialized

equipment (e.g., laundromats and gas stations).[4] Moreover, the services that such

establishments provide to the public (not surprisingly) are intended for the public's use in

achieving a desired end (e.g., a hair cut, clean clothes, legal advice).[5] Therefore, viewing

the statute with the foregoing considerations in mind, every service establishment listed in

---

[4]      Of course some of the entities listed in subsection (7)(F) could conceivably provide the public a "service" in both forms—that is, they could provide the public both expertise and specialized equipment.  For example, a gas station might provide the public specialized equipment for obtaining gasoline but also expertise in repairing malfunctioning automobiles.  It is reasonable to conclude that, in some circumstances, unenumerated entities that qualify as service establishments under subsection (7)(F) may provide a "service" to the public in both forms as well.

[5]      This understanding of "services" in the context of the examples in subsection (7)(F) is consistent with the common view of the term "service."  As the majority notes, in discerning the ordinary meaning of a term, we generally look to standard dictionaries.  *See, e.g.*, *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 (10th Cir. 1998) ("[T]he ordinary meaning attached to the word . . . may be found by aid of commonly accepted dictionary definitions.").  Looking there, as a general matter, "service" means any "conduct or performance that assists or benefits someone or something."  WEBSTER'S*, supra*, at 2075; *see also* THE NEW OXFORD AMERICAN DICTIONARY 1549 (2d ed. 2005) [hereinafter OXFORD] (defining "service" as, *inter alia*, "an act of assistance").  A service typically does not produce a tangible good for a customer or client.  *See* WEBSTER'S, *supra*, at 2075 (defining "service" as, *inter alia*, "useful labor that does not produce a tangible commodity," and "providing services rather than tangible goods"); OXFORD, *supra*, at 1549 (defining "service" as, *inter alia*, "work done for a customer other than manufacturing").  Though they joust about the specific import of subsection (7)(F) with respect to plasma-donation centers, the parties (along with the majority) appear to share this general understanding of the foundational term "service."  *See, e.g.*, Aplt.'s Opening Br. at 13 ("[A] natural reading of the term 'service establishment' plainly includes any facility, open to the public, where commercial exchange involving *an intangible benefit* is conducted." (emphasis added)); Aplee. Br. at 16 ("The most relevant dictionary definition of 'service' is 'useful labor *that does not produce a tangible commodity*.'" (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1070 (10th ed. 1996))).

12

§ 12181(7)(F) shares some key unifying traits: they offer to the public a "service" (1) in the form of (a) expertise (e.g., barbers, beauticians, shoe-repair craftsman, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, pharmacists, health care providers, and hospitals) or (b) specialized equipment (e.g., laundromats and gas stations), (2) for use in achieving some desired end of the public, (3) in exchange for compensation.

In contrast to this method of arriving at a definition of "service establishment," the majority contends that we may glean the meaning of the phrase by simply combining the dictionary definitions of the terms "service" and "establishment." This analysis is misguided, however, because the operative term under subsection (7)(F) is "service establishment"—a statutory term that my analysis shows has a meaning quite distinct from the dictionary definitions of its component words. Although the ordinary meaning of the terms "service" and "establishment" may be helpful in discerning the meaning of the statutory term "service establishment," it is critical that courts eschew the analytical misstep of concluding that the unambiguous meaning of a statutory term may be divined perforce from the ordinary meaning of its component terms. *See Yates v. United States*, --- U.S. ----, 135 S. Ct. 1074, 1081 (2015) (plurality opinion) ("Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words."); *see also Barks v. Silver Bait, LLC*, 802 F.3d 856, 862 (6th Cir. 2015); *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 324 (4th Cir. 2015). Regrettably, the majority's narrow focus on the dictionary definitions of the terms "service" and "establishment"

13

leads it to fall prey to precisely this analytical misstep. As a consequence, the majority

misguidedly eschews the well-established contextual methodology of examining the

statutory language surrounding the term at issue. *See, e.g.*, *Yates*, 135 S. Ct. at 1082

(plurality opinion) ("In law as in life, however, the same words, placed in different

contexts, sometimes mean different things."); *Brune*, 767 F.3d at 1022 ("[N]o statute is an

island unto itself.").[6]

In sum, I would conclude that to qualify as a "service establishment" under

---

[6] Additionally, the majority asserts that applying the well-established canons of construction discussed herein runs afoul of the principle of statutory construction that "counsels against reading . . . a direction-of-compensation requirement into the statute when one doesn't appear there." Maj. Op. at 10. In this regard, the majority cites *United States v. Sturm*, where we cautioned that "[c]ourts must 'ordinarily resist reading words or elements into a statute that do not appear on its face.'" 673 F.3d 1274, 1279 (10th Cir. 2012) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)). However, relying on canons of construction to glean Congress's intent from the statute's language is a far cry from reading words into a statute that simply are not there. At all times, in applying these canons, the focus is on the words of the statute and what they convey about Congress's intent. *See, e.g.*, *PrimeTime 24 Joint Venture*, 245 F.3d at 1225 ("[T]he canons of construction focus on the text actually approved by Congress and made a part of our country's laws."). Congress provided textual examples in subsection (7)(F) that it intended to be illustrative of the meaning of the term "service establishment," *cf.* Scalia & Garner, *supra*, at 61 ("The canons influence not just how courts approach texts but also the techniques that legal drafters follow in preparing those texts."), and those examples indicate that in order to be a "service establishment," an entity must receive compensation from the public for services rendered. Furthermore, unlike the defendant in *Sturm*, I do not contend that Congress omitted the compensation component through some "scrivener's error" and that we should now correct that "error" by reading that component back into the statute. *See Sturm*, 673 F.3d at 1278–79. Instead, I maintain that the plain terms that Congress provided us in subsection (7)(F) are imbued with the compensation component and applying canons of construction makes this patent. *See Chickasaw Nation*, 534 U.S. at 94 (canons of construction are "designed to help judges determine the Legislature's intent *as embodied in particular statutory language*." (emphasis added)). There is no language that needs to be added.

14

§ 12181(7)(F), an entity must offer the public a service in the form of expertise or specialized equipment for use in achieving some desired end of the public in exchange for compensation. As explained below, plasma-donation centers do not satisfy this description.

4

In arguing that plasma-donation centers are "service establishments" under subsection (7)(F), Mr. Levorsen and the United States assert that "a plasma donation center provides at least two discrete services: (1) screening the individual's blood to ensure the donor's eligibility for a donation and (2) using its technology and trained personnel to extract and properly process the individual's plasma." Aplt.'s Opening Br. at 20; *see also* Br. for U.S. as Amicus Curiae at 22 ("Plasma donation centers have these same characteristics [as the examples listed in § 12181(7)(F)]. They provide the specialized equipment needed to procure plasma and trained personnel to assess donor eligibility, operate the equipment, etc."). For purposes of my analysis, I assume that they are correct. Indeed, in some material respects, these two alleged services seem to fit comfortably within the category of "services" that, in my view, subsection (7)(F) contemplates, in that they would involve providing the public with expertise (e.g., blood screening for donor eligibility) and specialized equipment (e.g., equipment capable of performing plasmapheresis).

However, I would nonetheless conclude that under the definition of "service establishment" discussed above, for two principal reasons, plasma-donation centers like

15

Octapharma fail to qualify as service establishments within the meaning of § 12181(7)(F).

First, plasma-donation centers do not receive a fee from members of the public in exchange for any services that they furnish.  Quite the obverse is true: the centers give members of the public a fee for tendering to them a commodity in the form of plasma or, alternatively, for performing—at least in a colloquial sense—the "service"[7] of donating plasma.  Put more concretely, unlike the service establishments found in subsection (7)(F), Octapharma did not receive money from Mr. Levorsen in exchange for a service; instead, it paid Mr. Levorsen.  Therefore, plasma-donation centers are fundamentally unlike the service establishments of subsection (7)(F); all of them provide services to the public in exchange for a fee.

Second, to the extent that plasma-donation centers provide services to the

---

[7] The district court suggested that plasma donors like Mr. Levorsen may be viewed as providing a service to plasma-donation centers like Octapharma.  In this regard, it observed that "it is the plasma donation center that offers money to a member of the public in exchange for a service to the center—the donation of plasma."  Aplt.'s App. at 37.  However, as noted *infra* in Part I.B, plasma-donation centers actually resemble manufacturers much more than they do the typical business under subsection (7)(F) that provides services to the public, and thus it is probably closer to the truth to say that Mr. Levorsen is providing a commodity for Octapharma's manufacturing process.  Indeed, in his complaint, Mr. Levorsen avers that the plasma that he donates is "used as source material for further manufacturing use."  Aplt.'s App. at 8.  However, for purposes of analyzing the plain terms of the statute, the proper characterization of the donor's action as providing a commodity or service is immaterial.  Rather, the important point is that—irrespective of whether Mr. Levorsen (and other donors) provided Octapharma a commodity or a service—in exchange, he received a fee *from Octapharma*, whereas, in contrast, all of the service establishments listed in subsection (7)(F) received a fee *from the public* for their service, rather than paying one.  Therefore, in my view, Octapharma's business practice of paying plasma donors does not fit the paradigm of service establishments described in subsection (7)(F).

16

public—such as those services identified by Mr. Levorsen and the United States—they do not do so for the *public's* use in achieving a desired end; instead, they provide them for the *centers'* use in achieving a desired end. More specifically, plasma-donation centers provide the public with the expertise associated with blood screening and the specialized equipment necessary to collect plasma so that the centers can sell the plasma to their customers in the pharmaceutical industry (i.e., the desired end)—not so that they can assist the public to achieve some desired end. Or, viewed through the lens of these facts, Octapharma provided Mr. Levorsen its expertise and specialized equipment so that it could obtain his plasma for sale (i.e., the desired end), not to allow Mr. Levorsen to achieve some desired end.

This Octapharma-Levorsen scenario is patently at odds with the service-establishment paradigm that subsection (7)(F) envisions: specifically, every service establishment listed in that subsection offers members of the public a service—i.e., expertise or specialized equipment—for use in achieving an end *desired by them* (e.g., clean clothes, a haircut, repaired shoes)—not an end desired by the service establishment. Thus, the majority's conclusion that plasma-donation centers are service establishments under subsection (7)(F) effectively turns the statute's service model on its head—the recipient of the desired end (as well as the payor) is the plasma-donation center and not the public.[8]

---

[8]    To be sure, Mr. Levorsen receives a fee for his plasma donation, and the complaint's averments indicate that he clearly desires such payments. But such fees

17

Indeed, once one recognizes that it is the plasma-donation center, and not the

public, that is the recipient of the desired end, the first point of distinction discussed *supra*

between plasma-donation centers and subsection (7)(F)'s service establishments—i.e., the

fact that plasma-donation centers pay a fee rather than receive one—makes perfect sense.

Specifically, because the centers are the ultimate recipients of the desired end, it should

not be surprising that the centers are the ones providing the compensation, rather than the

public.

In sum, guided by well-settled canons of statutory construction, I would conclude

that plasma-donation centers are fundamentally unlike the service establishments listed in

42 U.S.C. § 12181(7)(F).  And, consequently, they do not fall within the ambit of that

provision.  It ineluctably follows that plasma-donation centers are not public

accommodations under Title III of the ADA.  Accordingly, I would hold that the district

court did not err in dismissing Mr. Levorsen's complaint.

**B**

The foregoing conclusion—that plasma-donation centers are not service

cannot be the desired end of the service under subsection (7)(F) because the statute
contemplates that the service establishment will provide the service to the public *in
exchange for* a fee that *it* receives; the statute does not envision that a member of the
public will receive from the service establishment both the service and the fee.  In other
words, viewed through the prism of subsection (7)(F), the fee cannot be the desired end
that the public seeks to achieve from the plasma-donation centers because the statute
contemplates that it is the *service establishment* that will receive the fee in exchange for
providing the desired end.

18

establishments within the ken of subsection (7)(F)—rests squarely on the plain terms of the statute, viewed through the prism of well-settled canons of interpretation that allow consideration of the relevant statutory context.  And that conclusion, I believe, is a sufficient basis for affirming the district court's judgment.  However, it is strongly reinforced by the observation that plasma-donation centers resemble manufacturers much more than they do the kind of entities that customarily provide services to the public under subsection (7)(F).  Plasma-donation centers manufacture a product: plasma.  They derive this product from a raw commodity—i.e., whole blood—that donors provide in exchange for a fee.  In this regard, plasma-donation centers are more like paper mills—a type of manufacturer—than the typical business that provides services to the public under subsection (7)(F).  Paper mills, like plasma-donation centers, offer a fee in exchange for a raw first-stage input (wood), which they convert first to pulp and, ultimately, into a marketable end-product (paper), for sale to end users.[9]

In accord with this observation, at least for some purposes, Congress clearly regards plasma-donation centers as manufacturers.  *See, e.g.*, 42 U.S.C. § 262(a)(1)(B)(ii) (requiring that each package of a biological product be marked with the identity "of the

---

[9]    *See generally Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1022 (D.C. Cir. 1978) ("To make paper from trees is an old art . . . .  In papermaking, logs or wooden chips must be ground up or 'cooked' in one of several processes until only cellulose pulp is left.  The pulp is bleached and made into various types and grades of paper."); Christopher D. Knopf, *Closing the Loop: Requiring Double-Sided Copying and Non-Chlorine Bleached Recycled Paper for Federal Court Papers*, 1995 WIS. L. REV. 345, 356 ("Paper mills typically produce paper from wood by first stripping bark from logs and grinding these stripped logs into chips.").

manufacturer of the biological product"); *id.* § 262(i)(1) ("The term 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, [or] *blood component . . .* applicable to the prevention, treatment, or cure of a disease or condition of human beings." (emphasis added)).

Moreover, a regulatory agency, the Federal Drug Administration ("FDA"), too, regards plasma-donation centers as "manufacturers," and all their activities—including the services that Mr. Levorsen and the United States identified—as "steps in the manufacturing of Source Plasma." 21 C.F.R. § 640.71(a) ("All steps in the manufacturing of Source Plasma, including donor examination, blood collection, plasmapheresis, laboratory testing, labeling, storage, and issuing shall be performed by personnel of the establishment licensed to manufacture Source Plasma . . . ."); *id.* § 600.3(t) ("Manufacturer means any legal person or entity engaged in the manufacture of a product subject to license under the act . . . ."); *id.* § 606.171(a) ("Who must report under this section? You, a licensed manufacturer of blood and blood components, including Source Plasma . . . .").

Thus, the observation that plasma-donation centers resemble manufacturers much more than they do the typical business that provides services to the public under subsection (7)(F) is validated by the regulatory judgment of Congress and the FDA. And this observation bolsters the conclusion that I would reach based on an analysis of the plain terms of § 12181(7)(F)—*viz.*, plasma-donation centers are not service establishments within the meaning of subsection (7)(F).

20

**II**

For the foregoing reasons, I am constrained to dissent. Contrary to the majority, I would conclude that the district court did not err in dismissing Mr. Levorsen's complaint because he failed to demonstrate, as a matter of law, that plasma-donation centers are service establishments under 42 U.S.C. § 12181(7)(F). Accordingly, I would affirm the district court's judgment.